2012 WY 148

Rolly REDLAND, Kendrick Redland, and Teresa Shelton, individually and as Beneficiaries of the Robert and Irene Redland Family Trust, Dated August 10, 1989, Appellants (Plaintiffs),

v.

Robert REDLAND, Individually, Robert Redland, as Trustee of the Robert and Irene Redland Family Trust Dated August 10, 1989, Lisa Kimsey and Mike Kimsey, Appellees (Defendants),

and

Robert Redland, as Trustee of the Robert Redland Revocable Trust, dated October 30, 2002, and as Successor Trustee of the Irene Redland Revocable Trust, dated October 30, 2002, Appellee (Plaintiff).

Robert Redland, Appellant (Defendant/Third Party Plaintiff),

v.

Rolly Redland, Kendrick Redland, Roalene McCarthy, and Teresa Shelton, individually and as Beneficiaries of the Robert and Irene Redland Family Trust, Dated August 10, 1989, Appellees (Plaintiffs),

and

Sharon Redland, Appellee (Third Party Defendant).

Roalene McCarthy, Appellant (Plaintiff),

v.

Robert Redland, Individually, Robert Redland, as Trustee of the Robert and Irene Redland Family Trust Dated August 10, 1989, Lisa Kimsey and Mike Kimsey, Appellees (Defendants).

Nos. S–12–0010, S–12–0011, S–12–0012.

Supreme Court of Wyoming.

Nov. 21, 2012.

their father, Robert Redland, agreed to place in a family trust. The district court granted Robert Redland partial summary judgment, holding that the claims were barred by the statute of limitations and by the statute of frauds, and the Redland Children appeal that summary judgment order.[1]

[¶2] Following the entry of partial summary judgment, a bench trial was held on the remaining issues. Among the issues tried were claims for unjust enrichment by the two Redland sons, Rolly Redland and Kendrick Redland, against Robert Redland for improvements that they had made to the disputed trust properties. The trial court ruled against Robert Redland on the unjust enrichment claims and awarded damages to both Rolly and Kendrick Redland. The trial court also ruled against Robert Redland on his counterclaim against Kendrick Redland, and his wife, Sharon, for a partnership interest in Kendrick and Sharon Redland's Angus cattle operation. In Appeal No. S–12–0011, the father appeals the trial court's rulings on the unjust enrichment and partnership claims.

[¶3] We reverse the entry of summary judgment and affirm the trial court's rulings on the unjust enrichment and partnership claims.

Representing Appellants/Appellees Rolly, Kendrick, Sharon and Debbie Redland and Teresa Shelton: S. Joseph Darrah of Darrah Law Office, P.C., Powell, WY.

Representing Appellees/Appellants Robert Redland and Roalene McCarthy: J. Kenneth Barbe II of Welborn Sullivan Meck & Tooley, P.C., Casper, WY; Ronald P. Jurovich, Thermopolis, WY; and Steve C.M. Aron of Aron and Hennig, LLP, Laramie, WY.

No appearance entered for Appellees Lisa and Mike Kimsey in S–12–0010 and S–12–0012.

No appearance entered for Appellees Roalene McCarthy and Teresa Shelton in S–12–011.

Before KITE, C.J., and GOLDEN *, HILL, VOIGT, and BURKE, JJ.

HILL, Justice.

[¶1] These consolidated appeals stem from the Redland family's dispute over ranch property and operations. Appeals numbered S–12–0010 and S–12–0012 relate to real property that some of the Redland children claim

## ISSUES

[¶4] Appeals S–12–0010 and S–12–0012 are both appeals from the district court's order granting partial summary judgment. In S–12–0010, which was filed by three of the Redland children, Rolly Redland, Kendrick Redland and Teresa Redland Shelton, the following issues are presented for this Court's review:

> 1. Whether the District Court erred when it determined the [S]tatute of Frauds barred Appellants' claims for declaratory judgment, recovery of real property, estoppel and specific perform-

---

* *Justice Golden retired effective September 30, 2012.*

1. This action was brought by four of the five Redland children, Rolly, Kendrick, Roalene, and Teresa. The youngest child, Lisa, is aligned with her father, Robert. For ease of reference, we will refer to the four Redland children collectively as the "Redland Children," and we will refer to Robert Redland, individually and as trustee, and his daughter, Lisa, collectively as "Robert Redland."

ance after Appellants had fully performed the agreement?

2. Whether the District Court erred when it determined that the applicable statute of limitations barred Appellants' claims for declaratory judgment, recovery of real property, estoppel and specific performance when there was no evidence that Appellants knew or should have known that the Agreement was breached before the limitations period expired?

[¶ 5] In Appeal S–12–0012, Roalene Redland McCarthy, in a separately filed appeal from the summary judgment ruling, states the issues differently but presents essentially the same questions for our review:

ISSUE I: For purposes of the Statute of Limitations, when did the cause of action for specific performance accrue?

ISSUE II: Whether full performance by the Appellant of a Trust Agreement presented a genuine issue of material fact that precluded entry of summary judgment on the basis of the Statute of Frauds.

ISSUE III: Did the discovery of a breach present a genuine issue of material fact that precluded entry of summary judgment for filing outside the Statute of Limitations?

ISSUE IV: Where one of seven parties to a Trust Agreement breached the contract, was it error in applying the "discovery rule" for the District Court to impute to Appellant what that court apparently concluded was either known or should have been known by others of the non-breaching contracting parties?

[¶ 6] In Appeal S–12–0011, Robert Redland appeals the district court's rulings following a bench trial and presents the following issues on appeal:

A. *Issues Related to Unjust Enrichment*

1. Did the trial court err when it found that Rolly Redland and Kendrick Redland had proven the elements of unjust enrichment?

2. If Rolly Redland and Kendrick Redland proved the elements of unjust enrich-

ment, did the trial court err in the amount of the damages awarded?

B. *Issues Related to Redland Angus*

1. Did the Court err when it admitted Plaintiff's Exhibit 105 redacting Plaintiff's sticky note which said "part of bull sale[?]"

2. Did the Court err when it found that Robert Redland is not and was not a partner in Redland Angus?

## FACTS RELATING TO DISPUTED TRUST PROPERTY

[¶ 7] The claims regarding the disputed trust property include the Redland Children's claims that certain property should be conveyed to the family trust, and Rolly and Kendrick Redland's alternative claims for unjust enrichment for improvements made to that property. Those claims are independent from and unrelated to Robert Redland's claims to a partnership interest in Kendrick and Sharon Redland's Angus cattle operation, Redland Angus. We will thus set forth the facts relating to the trust property claims and those relating to the Redland Angus operation separately. In this first part of the opinion, we will set forth the facts relating to the disputed trust property, and the legal proceedings that led to the present appeal. We will set forth the facts relating to Robert Redland's claims to a partnership interest in Redland Angus in the latter part of the opinion when we discuss that portion of Robert Redland's appeal.

### A. *Disputed Trust Property*

### 1. *Property Names*

[¶ 8] The Redland property that is in dispute and that will be discussed throughout this opinion is located in three areas of the Big Horn Basin. It includes the following:

### *Manderson Place*

[¶ 9] The Manderson Place is located in Big Horn County. The parties variously refer to the deeded portion of this property as the Manderson Farm, the Manderson Place or the Home Place. Associated with this property is State of Wyoming Lease No. 3–8179. Also associated with the property is Bureau of Land Management (BLM) Lower

Nowood Allotment No. 00144. For ease of reference, throughout this opinion, we will refer to the deeded property as the "Manderson Place," and to State Lease No. 3–8179 by number or as the "State Farm at Manderson."

### Original Mountain Land & Additional Mountain Land

[¶ 10] The Original Mountain Land is located in Washakie and Johnson Counties. Associated with the deeded property is State of Wyoming Lease No. 3–8195, BLM Box Canyon Allotment No. 02008, and BLM Cedar Ridge Allotment No. 00145. For ease of reference, when we refer to State Lease No. 3–8195 separately, we will refer to it by number or as the "Mountain Land State Lease."

[¶ 11] The Additional Mountain Land is located in the area of the Original Mountain Land and is deeded land that was owned by Eric Redland, Robert Redland's brother, until Eric's death in 1992.

### Woody Place

[¶ 12] Woody Place is also located in Washakie County, south of the Mountain Land. Associated with this property is State of Wyoming Lease No. 3–8248, BLM West Allotment No. 00147, and BLM East Allotment No. 00146. For ease of reference, we will refer to State Lease No. 3–8248 by number or as the "State Lease at Woody Place."

### 2. History of the Property and Events Leading to Dispute

[¶ 13] Richard and Nellie Redland were the parents of Robert Redland and the grandparents of Robert and Irene Redland's five children: Rolly Redland, Kendrick Redland, Roalene Redland McCarthy, Teresa Redland Shelton, and Lisa Redland Kimsey. Throughout their lifetimes, Richard and Nellie Redland accumulated ranching and farming property in the Big Horn Basin, including deeded land and federal and state leases, which they hoped would be held and operated by future Redland generations. All of the property that is in dispute in this action is property originally acquired by Richard and Nellie Redland.

[¶ 14] Robert and Irene Redland were married in 1951, and began living on Manderson Place in 1953. Sometime between 1959 and 1962, they purchased the Manderson Place from Richard and Nellie Redland. Robert and Irene raised their five children on the Manderson Place, and during those years they ran sheep on the Original Mountain Land and grew crops on BLM land near Manderson.

[¶ 15] In 1971, Robert and Irene Redland purchased Woody Place from Richard and Nellie Redland. The purchase included the deeded land and an assignment of the State Lease at Woody Place. The State Lease at Woody Place is important to the Woody Place operations because the leased land is adjacent to the deeded property and holds all of the operation's water.

[¶ 16] When Robert and Irene Redland purchased Woody Place in 1971, Rolly Redland, Robert's oldest son, was attending community college in Riverton, Wyoming. Robert called on Rolly to work the new property and to manage the cows Robert then owned. Woody Place required substantial work, including clean-up, fencing, and irrigation work, and after making some initial improvements to the property, Rolly stayed on and has since 1971 lived and ranched at Woody Place.

[¶ 17] Kendrick Redland began his full-time career as a rancher in 1973. Kendrick lived on Manderson Place, and he conducted his operations primarily on Manderson Place and the Original Mountain Land. While the two Redland sons lived on separate properties, they often operated together and with their father. This included running their cattle together and supplying veterinary care, breeding and feed for the cattle.

[¶ 18] Robert Redland's father, Richard Redland, passed away in 1971. In his will, he left to his wife, Nellie Redland, a life estate in all of his properties. To his sons, Robert and Eric Redland, he left a divided option to purchase the Original Mountain Land for $27.50 per acre, which option could not be exercised until the death of Nellie Redland. The will included any federal allotments and the Mountain Land State Lease in

the right to purchase, with no additional charge for those property interests.

[¶ 19] In March of 1983, Robert Redland paid Eric Redland $100,000 for his one-third option in the Original Mountain Land. As of 1983, then, Robert owned the entire option to purchase the Original Mountain Land as set forth in Richard Redland's will.

[¶ 20] By 1989, the operations of Robert Redland and his two sons, Rolly and Kendrick Redland, had grown, with each individually continuing to increase the number of livestock they were running. Also in 1989, Nellie Redland passed away, and Robert was able to exercise the option to purchase the Original Mountain Land as described in Richard Redland, Sr.'s will. Before exercising the option, however, Robert took two steps. First, on August 8, 1989, Robert assigned part of his purchase option to his wife, Irene, and then they both made partial assignments of their interests in the purchase option to their five children, with the end result being that Robert, Irene and their five children each owned a one-seventh interest in the option to purchase the Original Mountain Land. Robert's next step was to create a family trust.

[¶ 21] On August 10, 1989, Robert and Irene Redland executed a Trust Agreement with their five children, which created the Robert and Irene Redland Family Trust ("Redland Family Trust"). Robert, Irene and the five children were beneficial owners under the trust, and Robert and Irene were the trustees. The Trust Agreement established the trust for the purpose of holding and managing property. It provided as follows concerning property acquired by the trust:

The parties hereto declare that all property now held or hereafter acquired by the trustees or their successors, as trustees, and all income and profits therefrom, shall be by the trustees managed, administered, received, collected, disposed of, and distributed for the benefit of such persons as may from time to time be owners of beneficial interests in this trust estate, in the manner herein provided and subject to the terms and conditions set forth in this instrument and any amendments hereto.

[¶ 22] At its inception, the Trust Agreement identified only the first property the Redland Family Trust would hold, the Original Mountain Land. Concerning that property, the Trust Agreement specified:

Each of the above named parties transfers to this trust their interest in the options to purchase from the Estate of Richard Redland, Sr. .[sic] the lands described in Exhibit A annexed hereto subject to any indebtedness on said options and lands and the sum of $27,500.00.

[¶ 23] The Trust Agreement provided more specifically for the addition of property to the Redland Family Trust in Section Ten of the agreement, which stated:

The Parties hereto and any other beneficial owner of the trust estate may at anytime add other property acceptable to the trustee to the trust estate by conveyance, assignment, will or any other mode of transfer. Such property when received and accepted by the trustee shall become part of the trust estate and shall be subject to all the terms and conditions of this trust instrument.

[¶ 24] After the initial contributions were made to the Redland Family Trust, the trust exercised the option to purchase the Original Mountain Land. On September 11, 1989, the property was conveyed by warranty deed from the Estate of Richard Redland, Sr. to the Redland Family Trust. This conveyance created the circumstance for the first disputed Redland property.

[¶ 25] The Redland Children contend that when they each assigned their one-seventh interest in the option to purchase the Original Mountain Land and contributed cash to exercise that option, it was their intention and understanding that exercising the option would result in the trust acquiring the property described in Richard Redland Sr.'s will, which property included the deeded property, the BLM allotments, and the Mountain Land State Lease, that is, State Lease No. 3–8195. Robert Redland, on the other hand, contends that the only property conveyed to the trust when it exercised the option was the deeded land and the BLM allotments, and that the state lease was conveyed sepa-

rately to him in his individual capacity. We will set forth additional relevant facts related to this portion of the property dispute in our discussion of the district court's summary judgment order.

[¶ 26] In 1991, Eric Redland passed away, and Robert Redland approached the Redland Children and requested cash contributions to purchase land from Eric Redland's estate. The children agreed to the cash contributions, and two pieces of property were purchased from the estate. One property purchased was the Additional Mountain Land. By a Court Officer's Deed dated June 30, 1992, the Additional Mountain Land was conveyed to the Redland Family Trust. The other property purchased from Eric Redland's estate was State Lease No. 3–8179, the State Farm at Manderson. By order dated February 5, 1992, the probate court approved the sale of State Lease No. 3–8179 to Robert or Irene Redland. The record does not contain a court officer's deed conveying the property, but the parties do not dispute that State Lease No. 3–8179, the State Farm at Manderson, was conveyed to Robert or Irene Redland individually, and not to the Redland Family Trust. The conveyance of State Lease No. 3–8179 is the source of the second property dispute.

[¶ 27] The parties disagree as to the amount of the cash contributions made to purchase property from Eric Redland's estate and the property that those contributions were to be used to purchase. Robert Redland contends that each trust member contributed $13,000, which was just enough money to purchase the Additional Mountain Land, and that there was no agreement that the State Farm at Manderson would be purchased for the Redland Family Trust. The Redland Children contend that they contributed far more than $13,000 each and that the agreement was that the money would be used to purchase the Additional Mountain Land and the State Farm at Manderson, and that both properties would be placed in the trust. As with the other disputed property, we will set forth additional relevant facts related to this portion of the property dispute in our discussion of the district court's summary judgment order.

[¶ 28] In December of 1992, Robert and Irene Redland gifted by warranty deed to each of their children a one-fourteenth interest in Woody Place. Exhibit A to each warranty deed contained an identical property description, which description did not include a reference to State Lease No. 3–8248, that is, the State Lease at Woody Place. In January of 1993, Robert and Irene Redland repeated the same transaction, using identical warranty deeds, and transferred an additional one-fourteenth interest in Woody Place to each of their children. Thus, after the 1993 conveyance, Robert and Irene and each of their children owned a one-seventh interest in Woody Place.

[¶ 29] In 1995, Robert and Irene Redland and their children each conveyed their one-seventh interest in Woody Place to the Redland Family Trust. This conveyance is the source of a third property dispute between Robert Redland and the Redland Children. The Redland Children contend that the one-seventh interest in Woody Place, which they were each gifted and then each in turn conveyed to the trust, included the State Lease at Woody Place, State Lease No. 3–8248, and it was their understanding and intention when they agreed to convey the property to the trust, that the state lease was included. Robert Redland contends to the contrary, that none of the Woody Place transactions involving the children and the trust included a conveyance of the state lease, and that he retained individual ownership of that lease, separate from the Woody Place deeded property. Again, we will set forth additional relevant facts related to this portion of the property dispute in our discussion of the district court's summary judgment order.

[¶ 30] Also in 1995, an amendment to the Trust Agreement was executed. The amendment provided for the appointment of a successor trustee in the event of the death, resignation or inability to act of any trustee and required that there be two trustees serving at all times. The amendment also added a Section Fourteen to the Trust Agreement, which provided:

All B.L.M., Forest Service, and State leases and/or grazing permits added to the assets of the Trust shall remain the prop-

erty of the Trust unless and until a three-fourths (3/4) majority of the beneficial owners of the Trust estate agree in writing to the removal of the B.L.M., Forest Service and State lease and/or grazing permit from the assets of the Trust.

[¶ 31] Following formation of the Redland Family Trust, the subsequent land transactions and the amendments to the Trust Agreement, the Redlands continued to grow their operations. Robert, Rolly, and Kendrick Redland ran livestock together, and the BLM allotments associated with all of the Redland properties listed the individual brands of Robert, Rolly, and Kendrick as the brands allowed to run on the allotments. Rolly and Kendrick, and their families lived and operated on the Redland properties and made improvements to those properties.

[¶ 32] Rolly Redland and his family maintained Woody Place and in 1998, installed a manufactured home on the property, which Robert Redland approved of as long as Rolly paid for the home and all of the associated expenses. Kendrick Redland and his family lived and operated on the Manderson Place property and improved the trailer in which they were living by constructing an addition and a deck on a permanent foundation. They also improved the home by putting in a cistern, a septic system, and water lines, which also served the livestock operations, and by running a power line to the home. Kendrick and his wife paid for all of these improvements, and Robert Redland did not object to them. Kendrick and Sharon also constructed a feedlot on the Manderson Place property, for which they provided all of the materials and shared in the labor with one of Robert's laborers.

[¶ 33] In the spring of 1992, Kendrick and Sharon Redland also began working the land on the State Farm at Manderson (State Lease No. 3–8179). They cleaned up the land, began haying and irrigating, built two new hay yards, pulled out old ties and set new ones, repaired the corrals and fences, paid to have new fences built, built a new cattle working facility and purchased a cattle chute to be placed on the property. As with the improvements to the Manderson Place property, this work was performed with Rob-

ert Redland's knowledge and was paid for by Kendrick and Sharon.

[¶ 34] Sometime around 2000 or 2001, Rolly Redland and his wife, Deb, and their children, with the approval of Robert and Irene Redland, began living at least part of their time in a home on the State Farm at Manderson (State Lease No. 3–8179), so the children would be closer to the school they were attending. Rolly and his family cleaned and maintained the farmstead on the State Farm at Manderson, and also made other improvements to the property. They graded and graveled the road from the highway to the barnyard, built a calving shed, and installed water hydrants and tanks. Robert knew the improvements were being made, but other than the posts for the calving shed, which Robert supplied, Rolly paid the costs of the improvements.

### B. *Legal Proceedings*

[¶ 35] Sometime in 2006, Rolly Redland became concerned with the activities of Robert Redland and Lisa Redland Kimsey, Rolly's youngest sister. Robert had sold or given land on Manderson Place to Lisa on which to build a house, and it was land that Rolly had understood was land held by the Redland Family Trust. Also, Robert and Lisa were spending an unusual amount of time with Robert's attorneys in Casper. Rolly thus had a title search run. The title search revealed that property Rolly and his siblings, Kendrick, Roalene, and Teresa, thought was held by the Redland Family Trust, had not in fact been conveyed to the trust. This included Manderson Place, the State Farm at Manderson (State Lease No. 3–8179), the BLM allotments at Manderson, the Mountain Land State Lease (State Lease No. 3–8195), and the State Lease at Woody Place (State Lease No. 3–8248).

[¶ 36] In September 2007, Irene Redland passed away. A few days after Irene's funeral, Rolly Redland, Kendrick Redland, Roalene Redland McCarthy, and Teresa Redland Shelton prepared and presented to Robert Redland a document entitled Family Resolution Proposition. The document was a proposal to transfer all property into the Redland Family Trust that the Redland Chil-

dren originally believed had been placed in the trust and a proposal for the use of those lands going forward. Robert rejected the proposal.

[¶ 37] During this same time frame, shortly after Irene Redland's death, Robert Redland sold his sheep to his daughter Lisa Redland Kimsey, and her husband, Mike Kimsey. As part of the transaction, Robert leased some of the trust's mountain land to the Kimseys, for the purpose of running the sheep and providing guided hunts. Robert leased the property as trustee and did so before the appointment of a new trustee to succeed Irene Redland.

[¶ 38] In November 2007, Rolly Redland called a special meeting of the Redland Family Trust beneficial owners. Among the agenda items was appointment of a new co-trustee, to replace Irene Redland, the transfer of property to the trust, and the propriety of leases that Robert Redland had entered into as trustee without approval of a co-trustee. Rolly was elected co-trustee at the meeting, and the co-trustees, now Robert and Rolly Redland, did not agree on resolution of the remaining issues.

[¶ 39] In April 2008, the Redland Children filed a complaint against Robert Redland individually, Robert Redland as trustee of the Redland Family Trust, and Lisa Redland Kimsey and her husband, Mike Kimsey, (collectively "Robert Redland"). The Redland Children amended their complaint in May 2009, asserting claims:

1. For declaratory judgment that:

a. Rolly, Kendrick, and Robert Redland operated all of the family or trust properties as partners;

b. Robert and Irene Redland were required to transfer all Redland property, including deeded lands, state leases and BLM permits to the Redland Family Trust;

c. The Redland Family Trust requires any action of the trust to be approved by two trustees and any action taken without that approval is void;

d. A partnership by estoppel exists, or recognizing that the Redland Family Trust created a de facto partnership; and

e. Each beneficiary under the Redland Family Trust has an interest in directing its operations.

2. For declaratory judgment that the lease of trust lands Robert Redland made to Lisa and Mike Kimsey is void for failure to obtain approval by two trustees;

3. For declaratory judgment that Robert Redland must transfer all of the Redland property to the Redland Family Trust and should be estopped from claiming the properties as his own;

4. For an accounting of trust assets and funds;

5. For declaratory relief establishing a tie-breaking mechanism in the event the trustees of the Redland Family Trust are deadlocked; and

6. For the recognition of a constructive trust or equitable lien against Robert Redland's individual property to the extent that he misapplied trust assets or funds to his own use.

[¶ 40] Robert Redland denied all of the Redland Children's claims and asserted the following counterclaims:

1. As trustee, against Rolly Redland for rent and grazing fees on trust property;

2. As trustee, against Rolly Redland for hunting fees on trust property;

3. Personally, against Kendrick and Sharon Redland for an accounting and payment of partnership distributions from Redland Angus; and

4. Personally, against the Redland Children for a ruling that if Robert Redland had to contribute personal assets to the Redland Family Trust and be subject to an accounting, the Redland Children should be required to do likewise.

[¶ 41] Robert Redland moved for summary judgment, asserting that the Redland Children's claims to recover real property were barred by the statute of limitations and the statute of frauds. In this motion, Robert Redland also claimed that the Redland Family Trust was void because it violated the rule against perpetuities. The district court

granted Robert Redland's motion for summary judgment on the claims to recover real property, finding that no genuine issue of disputed fact existed and the claims were barred by the statute of limitations and the statute of frauds. Specifically, the district court found:

that there is no genuine issue as to any material fact of concern to those claims for relief, that Defendant Robert Redland is entitled to judgment as a matter of law with respect to those claims for relief, that the applicable statutes of limitations (whether it be under Wyo. Stat. Ann. §§ 1–3–103, 1–3–105, or 1–3–109) bar recovery on those claims for relief, and that Wyoming's statute of frauds, Wyo. Stat. Ann. § 1–23–105 and applicable case law, including *Davis v. Davis*, 855 P.2d 342 (Wyo.1993), *Fowler v. Fowler*, 933 P.2d 502 (Wyo.1997), and *Parkhurst v. Boykin*, 2004 WY 90, 94 P.3d 450 (Wyo.2004), preclude recovery on those claims for relief, as asserted in this action.

[¶ 42] In that same order, the district court allowed Robert Redland to amend his counterclaims to seek declaratory relief that the Redland Family Trust violates the rule against perpetuities; to seek ejectment of Kendrick and Sharon Redland from the Manderson Place; and to seek ejectment of Rolly and Debbie Redland from the State Farm at Manderson. Robert's amended counterclaims also included claims against Rolly Redland for conversion of a sheep wagon and a tractor. In response, Kendrick, Rolly and their spouses counterclaimed for the value of the improvements that they had made to Manderson Place and the State Farm at Manderson.

[¶ 43] Shortly after the district court's entry of summary judgment, Rolly Redland filed a motion requesting that Judge W. Thomas Sullins recuse himself from the case, asserting a conflict of interest because Judge Sullins was a former partner in the law firm that represented Robert Redland, and because that same law firm drafted many of the trust documents that would be ruled on at trial. Judge Sullins denied any conflict of interest but entered an order of recusal and

reassigned the case to the Honorable Keith G. Kautz.

[¶ 44] A five-day bench trial was held before Judge Kautz beginning on August 30, 2010. On December 2, 2010, while the case was under advisement, the parties filed a stipulation resolving certain of the issues. The Redland Children dismissed their first cause of action seeking declaratory judgment that the family operated as a de facto partnership, dismissed their claim for an accounting, dismissed their request for a court implemented trust tie-breaker mechanism, and dismissed their breach of fiduciary duty claim. They reserved their right to appeal the summary judgment order against their property claims. Robert Redland agreed to not pursue efforts to have Rolly Redland removed as a trustee, and Robert reserved his causes of action for contribution of assets and an accounting in the event the Redland Children succeed in the appeal of the partial summary judgment on their property claims. Last, the parties submitted to the court a tie-breaker amendment to the Redland Family Trust and requested that the court approve the amendment in the event the court ruled that the trust is valid and not void for violating the rule against perpetuities.

[¶ 45] On February 15, 2011, the district court issued its decision letter. The court made the following rulings:

—The court found that the Redland Family Trust does not violate the rule against perpetuities, and it approved the parties' stipulated tie-breaker amendment;

—The court found the lease agreements Robert Redland entered into with Lisa and Mike Kimsey for use of trust property were void for failure to obtain the required co-trustee approval;

—The court found that Rolly Redland owed the Redland Family Trust $6,360.00 for rent of the Woody Place for the year 2010;

—The court found no evidence that Rolly Redland had wrongfully withheld hunting fees for the Woody Place and found against Robert Redland on that claim;

—The court found that Robert Redland had not proven his claims for damages to Manderson Place or the State Farm

against Rolly and Kendrick Redland and denied those claims. The court further found that Rolly and Kendrick had vacated Manderson Place and the State Farm, and it concluded that Robert's ejectment action against them was thus moot;

—The court found that Kendrick Redland had proved his unjust enrichment claim for improvements to Manderson Place, and it awarded him damages in the amount of $28,737.00;

—The court found that Rolly Redland had proved his unjust enrichment claim for improvements to the State Farm at Manderson, and it awarded him damages in the amount of $14,040.00.

—In his closing argument, Robert Redland conceded that he had not proved his claim against Rolly Redland for conversion of a tractor. The court further found that Robert had not proved his claim against Rolly for conversion of a sheep wagon, and it ruled against Robert on that claim; and

—The court found that Robert Redland had not proved that he had a partnership interest in Redland Angus and denied all of Robert's claims relating to that operation.

[¶ 46] Following entry of the district court's judgment, Robert Redland appealed the court's rulings on Rolly and Kendrick Redland's unjust enrichment claims and the court's ruling on the Redland Angus partnership claims. The Redland Children appealed the order granting partial summary judgment against their property claims.

## STANDARD OF REVIEW

[¶ 47] The Redland Children's appeal of the district court's order on their trust property claims is an appeal from a summary judgment order, and we therefore consider their appeal under our summary judgment standard of review. Motions for summary judgment come before the trial court pursuant to Rule 56(c) of the Wyoming Rules of Civil Procedure, which requires that

[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Formisano v. Gaston*, 2011 WY 8, ¶ 3, 246 P.3d 286, 288 (Wyo.2011). We review a grant of summary judgment as follows:

We review a summary judgment in the same light as the district court, using the same materials and following the same standards. *Id.; 40 North Corp. v. Morrell*, 964 P.2d 423, 426 (Wyo.1998). We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Id.* A material fact is one which, if proved, would have the effect of establishing or refuting an essential element of the cause of action or defense asserted by the parties. *Id.* If the moving party presents supporting summary judgment materials demonstrating no genuine issue of material fact exists, the burden is shifted to the non-moving party to present appropriate supporting materials posing a genuine issue of a material fact for trial. *Roberts v. Klinkosh*, 986 P.2d 153, 155 (Wyo.1999); *Downen v. Sinclair Oil Corp.*, 887 P.2d 515, 519 (Wyo. 1994). We review a grant of summary judgment deciding a question of law de novo and afford no deference to the district court's ruling. *Roberts v. Klinkosh*, 986 P.2d at 156; *Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1275 (Wyo.1997).

*Lindsey v. Harriet*, 2011 WY 80, ¶ 18, 255 P.3d 873, 880 (Wyo.2011).

[¶ 48] Because the unjust enrichment and partnership rulings appealed by Robert Redland were issued by the court following a bench trial, we apply the following standard of review:

Following a bench trial, this court reviews a district court's findings and conclusions using a clearly erroneous standard for the factual findings and a *de novo* standard for the conclusions of law. *Piroschak v. Whelan*, 2005 WY 26, ¶ 7, 106 P.3d 887, 890 (Wyo.2005).

The factual findings of a judge are not entitled to the limited review afforded a

jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Piroschak,* ¶ 7, 106 P.3d at 890. Findings may not be set aside because we would have reached a different result. *Harber v. Jense[n]*, 2004 WY 104, ¶ 7, 97 P.3d 57, 60 (Wyo.2004). Further,

> we assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it.

*Id.*

*Claman v. Popp,* 2012 WY 92, ¶ 22, 279 P.3d 1003, 1012 (Wyo.2012) (quoting *Pennant Serv. Co., v. True Oil Co., LLC,* 2011 WY 40, ¶ 7, 249 P.3d 698, 703 (Wyo.2011)). We review the district court's conclusions of law *de novo. Lieberman v. Mossbrook,* 2009 WY 65, ¶ 40, 208 P.3d 1296, 1308 (Wyo.2009).

## DISCUSSION OF DISPUTED TRUST PROPERTY ISSUES

### A. *Redland Children's Partial Summary Judgment Appeal*

[¶ 49] The parties' property dispute stems from the formation of the Redland Family Trust. The Redland Children contend that when Robert Redland approached them with the proposal to form a trust to hold the Redland properties, which would require contributions of capital by all of the parties, he promised that, in exchange for those contributions, all Redland property would be conveyed to the trust and managed as required by the trust. Robert Redland disagrees that any such promise was made.

[¶ 50] The parties do not dispute that the Redland Family Trust owns the Original Mountain Land, including its associated BLM allotments, the Additional Mountain Land and Woody Place. The property in dispute is Manderson Place, which is deeded land, the State Farm at Manderson (State Lease No. 3–8179), the Mountain Land State Lease (State Lease No. 3–8195), and the State Lease at Woody Place (State Lease No. 3–8248).

[¶ 51] The district court found no genuine issues of material fact existed and that as a matter of law, the Redland Children's claims to the disputed property were barred by the statute of limitations and the statute of frauds. We address first the statute of limitations ruling and then the statute of frauds ruling.

### 1. *Statute of Limitations*

[¶ 52] The Redland Children's property claims assert a breach of either an oral or written agreement to convey real property. The applicable statute of limitations is thus either ten years or eight years. *See* Wyo. Stat. Ann. § 1–3–105(a)(i) (ten years for action on written agreement); Wyo. Stat. Ann. § 1–3–105(a)(ii)(A) (eight years for action on oral agreement); Wyo. Stat. Ann. § 1–3–103 (ten years for action to recover real property).

[¶ 53] The Redland Children argue that the statute of limitations did not begin to run until 2006 when they discovered that Robert Redland had not conveyed the disputed property to the trust as they contend he had promised. Robert Redland contends that the statute of limitations began to run in 1992 at the latest, the date by which Robert had ownership of all the property he allegedly promised to convey to the trust. On review of the summary judgment record, we conclude that when the statute of limitations began to run is a disputed issue of fact.

[¶ 54] Wyoming is a discovery jurisdiction, which means that a statute of limitation is triggered when a plaintiff knows or has reason to know of the existence of a cause of action. *Carnahan v. Lewis,* 2012 WY 45, ¶ 27, 273 P.3d 1065, 1073 (Wyo.2012);

*see also Platt v. Creighton,* 2007 WY 18, ¶ 11, 150 P.3d 1194, 1200 (Wyo.2007); *Olson v. A.H. Robins Co.,* 696 P.2d 1294, 1297 (Wyo. 1985). We have explained:

> That is, the statute begins to run when the claimant is chargeable with information which should lead him to believe he has a claim. If the material facts are in dispute, the application of a statute of limitations is a mixed question of law and fact; otherwise, it is a question of law.

*Carnahan,* ¶ 27, 273 P.3d at 1073 (citations omitted).

[¶ 55] The Redland Children support their statute of limitations argument with the affidavits of Rolly Redland and Kendrick Redland, which they submitted in opposition to Robert Redland's motion for summary judgment. In those affidavits, Rolly and Kendrick describe the Redland Children's agreement with Robert and Irene Redland, the parties' conduct following that agreement, and their unequivocal statements that they did not know that the disputed property had not been placed in the Redland Family Trust until 2006.

[¶ 56] By affidavit, Rolly Redland attested that during meetings attended by Kendrick Redland and Robert and Irene Redland, to discuss the formation of the trust, Robert made repeated promises that "it is all going in (to the Trust), the farm and all of the property of Granddad's, is going into the Trust." Kendrick's affidavit is to similar effect. Kendrick stated that in the trust formation meeting, "[w]e all talked about ways to pass on the Land that Grand[d]ad & Grandma had put together and limit or avoid inheritance taxes." Kendrick further stated in his affidavit:

> At the meeting about setting up the family trust, Dad said that each of us kids contribute money from our CD's in order to secure and purchase all of the land that we were running our livestock on including the Farm at Manderson, the Woody Place at Ten Sleep, the Mountain Ground and the BLM & State grazing leases attached to those grounds. Bob made it very clear that all the ground we were running on

would eventually go into the trust over time and if Eric (Pooch) Redlands' [sic] ground became available, his part of the mountain & slope, the State Farm, or his ranch at Ten Sleep became available in the future, we needed to be in a position to acquire those also so that they could be put in the family trust we were setting up.

[¶ 57] After the Redland Family Trust was established and the Redland Children made the contributions that Robert Redland requested, the parties operated on and made improvements to Redland property, including both trust and now disputed trust property.[2] According to the affidavits of Rolly and Kendrick Redland, between the years 1989 and 2006, Robert Redland never informed Rolly or Kendrick that they were making improvements to land that was not trust land or were operating on property that did not belong to the Redland Family Trust. Concerning the improvements and operations, Kendrick stated in his affidavit, "Not once did Robert tell us that we were wasting our time because the property was not Trust property." Rolly stated that Robert "never once complained about us running cattle on what is now·non-Trust lands. Nor did he complain about all of the time and expense we were putting into non-Trust lands for very little return on the investment."

[¶ 58] Kendrick Redland denied any prior knowledge or understanding that Robert Redland had not conveyed the disputed property to the Redland Family Trust. He stated in his affidavit:

> We had no reason to know that some of the properties were not held in trust. Bob, myself and Rolly ran our cattle in common on the ground which is now disputed in this lawsuit. We had no reason to believe that the ground was not placed into the Family Trust.

[¶ 59] Rolly Redland stated likewise in his affidavit, "Not until about 2006 did I think otherwise." Rolly explained in greater detail:

> Around 2006 I became suspicious of what may be going on between my sister Lisa

---

2. The details of those contributions and improvements are more important to the statute of frauds question and will be set forth with greater specificity in that discussion.

Kimsey and my father. My father either sold or gave Lisa some land from the Home Place to build her house. At that time, my father and Lisa's noticeable activity at Brown, Drew and Massey and traveling to Casper allot [sic] raised suspicions. When I began to question Dad and Lisa, very hard, they got very nervous and aggressive with me. That is when we contacted Ken Baumister to run a title search. On its completion, we discovered for the first time that the property that my father had promised to place in the Family Trust in 1989 and 1992 was in fact not placed in Trust. We knew nothing about this before and fully believed that all of the property had been placed in Trust.

[¶ 60] In response to the allegations of the Redland Children, Robert Redland denied by affidavit any promise to convey the disputed properties to the Redland Family Trust. He further stated in his affidavit:

At various times over the years since 1989 some of my children have made various demands that I transfer my separate real property interests to the Redland Family Trust. While it has always been my hope and dream that our family farm/ranch would be held and enjoyed by my family for years to come, I have always refused the demands to place my property in the Redland Family Trust because I consider the property to belong to my wife and myself for us to do with it as we please.

[¶ 61] The summary judgment record shows a clear factual dispute concerning when the Redland Children had actual knowledge that Robert Redland had not conveyed the disputed property and had no intention of conveying the property. This factual dispute does not, however, end the question. Robert also contends that the limitations period began running in 1992 because the Redland Children had constructive or imputed knowledge of the breach when the alleged property conveyances were not recorded in 1992. He further contends that even if they did not have constructive notice, the Redland Children had reason to know that the disputed property had not been conveyed to the trust.

[¶ 62] We disagree that knowledge of the dispute may be imputed to the Redland Children based on the absence of recorded property conveyances. And, as with the actual knowledge of the dispute, we find that issues of fact exist as to when the Redland Children had reason to know that the disputed property had not been conveyed as allegedly promised.

[¶ 63] Robert Redland cites to *Wyo. Bank and Trust v. Haught*, 2003 WY 111, ¶ 10, 76 P.3d 301, 306 (Wyo.2003) for the proposition that "[c]onstructive or record notice is notice of all properly recorded claims and is inferred as a matter of law." The constructive notice discussed in that case, however, concerned notice that is imputed to a subsequent purchaser of real property. *Id.*, ¶¶ 9–10, 76 P.3d at 305–306. Robert has cited no authority extending the rule of imputed notice or knowledge to the determination of when a limitations period begins to run. Moreover, we find imputed notice to be contrary to the discovery rule, which, rather than automatically imputing knowledge, looks to the facts and surrounding circumstances to determine whether a plaintiff had reason to know of the existence of the cause of action.

[¶ 64] Our decision in a recent easement dispute illustrates this inquiry. In *Carnahan*, Lewis, a property owner asserting access rights based on a public access easement, brought an action against Carnahan, the burdened property owner. *Carnahan*, ¶ 1, 273 P.3d at 1067. Lewis did not file the action until 2007 when Carnahan installed a locked gate across the access road. *Id.* Carnahan moved for summary judgment, asserting that the statute of limitations began to run in 1994 when the prior owners of the Carnahan property recorded a vacated plat attempting to eliminate the easement. *Id.*, ¶ 2, 273 P.3d at 1067. The district court denied summary judgment, finding that questions of fact existed as to when Lewis knew or had reason to know of the cause of action. *Id.*

[¶ 65] After a bench trial, the district court held that the limitations period did not begin to run until 2007. The court reasoned

that the Lewises did not have notice of the need to bring suit to enjoy use of the easement until 2007 when the Carnahans erected the locked gate across the easement. *Carnahan*, ¶ 30, 273 P.3d at 1075. Our Court affirmed, concluding:

> The district court's findings are supported by the record. Mr. and Mrs. Lewis testified that they used Mountain View Loop on a regular basis from the time they purchased the unplatted property in 1994 until the Carnahans blocked access by installing a fence and a gate in 2007. Mr. Lewis testified that from 2003 when the Carnahans bought the property until they installed the fence and gate in 2007, he and his wife continued to use Mountain View Loop without objection from the Carnahans. Although Troy Griffith put up a gate and a no trespassing sign in 1995 or 1996, the Lewises testified they continued to use Mountain View Loop without objection by driving through the gate when it was open or opening the unlocked gate when it was closed. Troy Griffith testified that he saw the Lewises using Mountain View Loop, they were welcome on his property and he never denied them access to his property. Noel Griffith testified that he never instructed the Lewises not to drive on Mountain View Loop. Mr. Carnahan also testified that he did not object to Mr. Lewis driving on the portion of Mountain View Loop on the Carnahans' property because he was trying to be neighborly.
>
> In addition to this evidence, Mr. Lewis testified that he was not told prior to purchasing the unplatted portion of his property in 1994 that Mountain View Loop had been vacated. Mr. Lewis testified that he did not look at the official plat recorded with the county when he purchased the property and was not aware of the attempt to vacate Mountain View Loop; he relied on the plat provided to him by the seller. He testified that when he purchased additional tracts in 1999, the developer assured him Mountain View Loop was intact. Mr. Lewis testified that he became aware in 2003 that the Griffiths were trying to re-plat their property to remove tract lines and Mountain View Loop. He attended county meetings concerning the re-plat and was present when the Board of County Commissioners denied the re-plat. Based on the denial, Mr. Lewis believed the matter was settled. He testified that it was not until after the Carnahans installed the fence and locked gate in 2007 that his family was denied use of Mountain View Loop.

*Carnahan*, ¶¶ 30–31, 273 P.3d at 1075.

[¶ 66] We went on to explain that "the Lewises were not chargeable with information which should have lead them to believe they had a claim until 2007 when their access to and use of Mountain View Loop was obstructed by the Carnahans' erection of a fence with a locked gate." *Carnahan*, ¶ 32, 273 P.3d at 1075. That is, we looked beyond what was recorded in the property records and did not charge the plaintiff with that knowledge. Our approach is instead to consider all of the surrounding circumstances to determine when a plaintiff had reason to know of a property dispute.[3]

[¶ 67] We turn then to Robert Redland's next argument, that the Redland Children had reason to know well before 2006 that Robert had not conveyed the disputed property to the Redland Family Trust. Robert cites a number of circumstances that he argues should have alerted the Redland Children to the present dispute. We will address each alleged circumstance in turn:

> (iii) From all the facts and circumstances known to the person at the time in question, has reason to know it.

Wyo. Stat. Ann. § 4–10–104(a) (LexisNexis 2011).

The UTC does not contemplate imputed notice. It requires actual knowledge, receipt of notice, or, like the discovery rule, reason to know based on the surrounding circumstances.

---

3. This approach is also consistent with the Uniform Trust Code (UTC). The UTC defines, for purposes of trust-related issues, when a person has knowledge of a fact. It provides, in relevant part:

> (a) ... [A] person has knowledge of a fact if the person:
> (i) Has actual knowledge of it;
> (ii) Has received a notice or notification of it; or

### Rolly Redland's Mistrust of Robert Redland

[¶ 68] Robert Redland asserts:

Rolly also testifies that he had numerous 'contentious' meetings with his father from the start and that in 1992 his father took $60,000 from him without permission. If these were Rolly's true beliefs, he had or should have had suspicions dating back to 1989 and 1992.

[¶ 69] We reject this as the type of undisputed fact that should have alerted the Redland Children that Robert Redland had not and would not convey certain property as he had allegedly promised. First, it misstates Rolly Redland's statements concerning the $60,000 withdrawal from his account. In his affidavit, Rolly stated that Robert requested cash contributions so that he could purchase property for the trust from Eric Redland's estate and he gave Robert permission to "[g]o ahead and take money from me to do the deal." [ROA III: 694] Rolly then stated in his affidavit:

After I discovered that a significant amount of money had been taken out of my account by Robert Redland, I asked him why he took so much of my money. He replied: "Well, the Trust bought all of that land from Pooch's [Eric Redland's] estate that we talked about."

[¶ 70] Rolly Redland's affidavit does not state that he was angry with Robert Redland for the amount of cash he withdrew for the purchases or state that he was suspicious of him. Likewise, when Rolly referred to meetings during the formation of the trust as contentious, he did not indicate that he was suspicious of Robert's intentions.

[¶ 71] Our standard for reviewing an entry of summary judgment requires that we consider the evidence in the light most favorable to the non-moving party and give that party all favorable inferences that can be drawn from the evidence. See Lindsey, ¶ 18, 255 P.3d at 880. Robert Redland's request that we infer from Rolly Redland's affidavit a suspicion and mistrust that should have alerted the Redland Children to the present dispute asks us to read the evidence in a manner that turns our standard of review upside down. We will not give the cited evidence this improper inference, and the evidence is thus insufficient to support summary judgment.

### Trust Agreement's Failure to Include Disputed Property

[¶ 72] Robert Redland asserts:

When the trust agreement itself described only the options and $27,500 as the property to be contributed Rolly should have been more diligent to confirm that all of this [sic] parent's [sic] property had in fact been conveyed to the trust.

[¶ 73] While it is accurate that the Trust Agreement identifies only the Original Mountain Land purchase options and cash as the property initially contributed, this does not present an undisputed fact that as a matter of law alerted the Redland Children to a dispute. The Trust Agreement did not purport at the outset to identify all property held by the Redland Family Trust. The Trust Agreement created the trust and expressly provided that additional property could be added to the trust. This approach is illustrated by the conveyance of Woody Place to the trust. Robert and Irene Redland owned Woody Place when the trust was formed, and yet Woody Place was not conveyed to the trust until 1995.

[¶ 74] Kendrick Redland stated in his affidavit that the meetings regarding the trust included discussions of the tax consequences of the property transactions. Given those discussions, the Redland Children may have understood the piecemeal conveyances to have been an approach taken for tax purposes. Thus, while we do not dismiss the limited property identified by the Trust Agreement as a factor to be considered in the statute of limitations analysis, we do not find it to be conclusive evidence that the Redland Children should have known of the property dispute. Again, because we must give all favorable inferences to the non-moving party, we cannot infer from the Trust Agreement's limited property conveyance that the children should have been alerted to the dispute.

*Robert and Irene Redland's 1996 Visit to an Estate Planning Attorney*

[¶ 75] Robert Redland asserts:

In June 1996, the Omaha estate planning attorney arranged by Roalene to help her parents with their estate plan sent a letter making his recommendations regarding the Redland's estate plan. This letter was copied to Roalene. Even if Roalene denied getting the letter, just the fact that she arranged a meeting with an estate planning attorney suggests that at least she knew or should have known that her parents had not conveyed all of their property to the 1989 Trust. As a surgeon, one would expect Roalene to know that people without assets do not have a need for an Omaha estate planning attorney.

[¶ 76] As Robert Redland's argument intimates, there is no evidence in the summary judgment record that Roalene McCarthy or any of the other Redland Children in fact received a copy of or saw the referenced letter from Robert and Irene Redland's attorney. In the absence of evidence that the Redland Children knew what the letter advised or what was discussed in that meeting, the Redland Children could just as easily have assumed their parents were discussing the tax consequences of their estate planning or the disposition of assets other than real property. In a summary judgment posture, we certainly are not willing to stretch this evidence to include the inferences Robert Redland argues should have started the clock ticking on the statute of limitations.

*Public Documents Filed in Purchase of Eric Redland's Property*

[¶ 77] Robert Redland asserts:

When Robert and Irene acquire[d] the State Place (Wyoming Ag Lease 3–8179) from Eric Redland's estate, they did not hide the fact that the lease was being acquired by them individually. The petition and order filed in the probate clearly disclose that State Lease 3–8179 was conveyed to "Robert Redland or Irene Redland." Kendrick claims that he told his wife, Sharon, that "everything going into the trust had to go through Mom and Dad to keep the trust legal." This contention is not attributed to Robert, but even if it were Kendrick should have been alerted to follow up on the conveyance.

[¶ 78] The assertion assumes evidence that is not in the summary judgment record. Robert Redland's reference to Kendrick Redland's affidavit and the comment he indicated that he made to his wife suggests Kendrick saw the petition and order and was explaining it to his wife. In fact, as explained in Kendrick's affidavit, the comment was one Kendrick made to his wife when she questioned why they were writing a check for $30,000 to Robert Redland rather than directly to the Eric Redland estate to purchase property from the estate. The summary judgment record contains no evidence that Kendrick Redland or any of the Redland Children knew of or saw the petition and order showing that State Lease No. 3–8179 (the State Farm at Manderson) was purchased by Robert and Irene Redland in their individual capacity as opposed to in their capacity as trustees of the Redland Family Trust. The petition and order therefore do not provide sufficient evidence standing alone to support summary judgment on the statute of limitations question.

*Leasing of Property from Trust*

[¶ 79] Robert Redland asserts:

Rolly says that he was told by his father that "if the Trust held property and it was used by a beneficiary, it would have to be leased." If Rolly really was told this, then the fact that he and Kendrick were allowed to use the Manderson Place and the State Place without having a lease should have been a clear indication that those properties were not in the trust.

[¶ 80] While Rolly Redland's affidavit does contain Rolly's understanding of the leasing requirement, the summary judgment record contains no evidence to support the statement that no leases were in place. The record contains no evidence addressing whether leases were entered into or lease payments were made. This assertion therefore provides argument but no evidentiary support for the summary judgment ruling.

[¶ 81] The summary judgment record lacks sufficient evidence to support a finding that the statute of limitations barred the Redland Children's trust property claim. Factual disputes remain concerning when Robert Redland rejected the children's demands to convey property to the trust, giving them actual notice of the dispute. Resolution of those disputes will require credibility determinations by the trier of fact. Factual disputes also remain concerning when the Redland Children had reason to know that Robert Redland had not conveyed the disputed property to the trust. These disputes will again require a weighing of evidence and a determination of whether the Redland Children's asserted lack of knowledge is credible and supported by the facts and circumstances.

[¶ 82] Our finding of a factual dispute in this case does not conflict with our decisions in cases on which Robert Redland relies, *Swinney v. Jones,* 2008 WY 150, 199 P.3d 512 (Wyo.2008) and *Davis v. Davis,* 855 P.2d 342 (Wyo.1993). Both cases are distinguishable.

[¶ 83] In *Swinney,* the plaintiff sued to enforce an agreement to provide an easement. *Swinney,* ¶ 3, 199 P.3d at 514. When the parties originally agreed to an easement, the easement's location was not specifically described, and the district court thus looked to the following statute:

> For purposes of this act [section] an easement or agreement which does not specifically describe the location of the easement or which grants a right to locate an easement at a later date shall be valid for a period of one (1) year from the date of execution of the easement or agreement. If the specific description is not recorded within one (1) year then the easement or agreement shall be of no further force and effect.

*Swinney,* ¶ 8, 199 P.3d at 515–516 (quoting Wyo. Stat. Ann. § 34–1–141(c)).

[¶ 84] Applying this statute, the district court concluded that the cause of action accrued no later than one year from the making of the agreement, and because more than ten years had passed since that date, the court dismissed the action as time barred. *Swinney,* ¶ 5, 199 P.3d at 515. On appeal,

the plaintiff did not contest the date the limitations period began to run. *Id.,* ¶ 9, 199 P.3d at 516. Instead, the plaintiff argued that the defendant was equitably estopped from asserting a statute of limitations defense. *Id.* We rejected the argument, finding:

> The allegations are insufficient to support Sellers' contention that Sellers have alleged a sufficient factual basis to preclude Buyers from asserting the statute of limitations as an affirmative defense. Sellers did not allege that Buyers had any superior knowledge of the facts necessary to establish breach of the contract. Sellers did not allege that Buyers ever promised that they would not assert the statute of limitations as a defense. Sellers did not allege that Buyers concealed any facts that would have prevented Sellers from realizing that a breach had occurred within one year after the agreement had been executed. ***The fact that the easements were not provided by that date was known by all parties.***

*Swinney,* ¶ 12, 199 P.3d at 516–517 (emphasis added).

[¶ 85] Our holding in *Swinney* did not address the same type of factual dispute presented by this case, and the holding required a different analysis. We therefore find Robert Redland's reliance on *Swinney* misplaced.

[¶ 86] We likewise find *Davis* factually distinguishable. In *Davis,* a son sued his mother to enforce an oral contract by which the mother allegedly promised to convey the family ranch to the son. *Davis,* 855 P.2d at 344. The son alleged that his mother orally promised him that if he came and worked on the ranch and paid the remaining mortgage on the ranch, she would, upon completion of the mortgage payments, convey the ranch to him. *Id.* Several years after the son paid off the mortgage, his mother gifted the ranch to another of her sons. *Id.* We upheld the district court's summary judgment dismissing the action as time barred, explaining:

> [Son] lived there, and he knew that the property was [Mother's] to do with as she pleased. Over the years, [Mother] did just

that and, in the course of various dealings over the years, she maintained title to the property despite repeated requests by [Son] for her to sell it to him. [Mother] treated the property as her own, conveyed it, and encumbered it as she chose. [Son] knew of the transactions.

\* \* \*

[Son] contends that as early as 1963, after his father's death, [Mother] promised to him the entire ranch. While [Son] was unable to provide a specific date for that conveyance, he said that it was to be accomplished when the mortgage was paid off. That event occurred far more than ten years prior to the institution of [Son's] action. Furthermore, in the early 1970s, [Mother] conveyed part of the ranch away, which would constitute injury to any claimed right of [Son] and the breach would have occurred at that time. In 1980, more property was conveyed by [Mother]. Again, [Son] did nothing. [Son] obviously incurred injury at those times because [Mother] no longer could keep any promise to convey the ranch to him.

*Davis,* 855 P.2d at 349–350.

[¶ 87] The action before us presents factual disputes relating to when the plaintiffs knew or had reason to know of their cause of action. As the above-quoted findings from *Davis* illustrate, such factual disputes simply were not present in that case. We therefore again find Robert Redland's reliance on *Davis* to be misplaced.

### 2. *Statute of Frauds*

[¶ 88] In this portion of the opinion, we address the district court's ruling that based on the undisputed facts, the statute of frauds bars the Redland Children's claims to an interest in the contested property. The statute of frauds provides, in relevant part:

(a) In the following cases every agreement shall be void unless such agreement, or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith:

\* \* \* \*

(v) Every agreement or contract for the sale of real estate, or the lease thereof, for more than one (1) year.

Wyo. Stat. Ann. § 1–23–105(a)(v) (LexisNexis 2011).

[¶ 89] This Court has recognized the important legislative purpose that the statute of frauds serves:

The statute of frauds is an expression of "fixed legislative policy of the state" and is "absolutely necessary to preserve the title to real property from the chances, the uncertainty, and the fraud attending the admission of parol testimony."

*Fowler v. Fowler,* 933 P.2d 502, 504 (Wyo. 1997) (quoting *Remilong v. Crolla,* 576 P.2d 461, 464 (Wyo.1978)). This Court has also, however, observed the injustice that can result from an unwavering application of the statute of frauds and has thus adopted equitable exceptions to the statute's bar to oral agreements, including the doctrines of full or partial performance and promissory estoppel. *See Parkhurst v. Boykin,* 2004 WY 90, ¶¶ 15–21, 94 P.3d 450, 457–460 (Wyo.2004); *Hovendick v. Ruby,* 10 P.3d 1119, 1124 (Wyo.2000); *Fowler,* 933 P.2d at 504; *Davis,* 855 P.2d at 346–348.

[¶ 90] The doctrine of full or part performance will operate to avoid the statute of frauds under the following circumstances:

We have held that either full or part performance of a contract for the sale of land will avoid the statute of frauds defense. *Davis v. Davis,* 855 P.2d 342, 346 (Wyo.1993). The doctrine of part performance, however, will not be applied to avoid the statute of frauds unless the oral agreement sought to be enforced is just and certain and the elements of possession and part or full payment or its equivalent are proved beyond the possibility of findings to the contrary. *Davis,* 855 P.2d at 347.

*Parkhurst,* ¶ 15, 94 P.3d at 458 (quoting *Hovendick,* 10 P.3d at 1124). We have further held that where the performance alleged is part performance, that part performance must be substantial. *Davis,* 855 P.2d at 346.

[¶ 91] Like the doctrine of full or substantial part performance, a valid claim of promissory estoppel can defeat a statute of

frauds defense. *Davis,* 855 P.2d at 349. The elements of promissory estoppel are:

> (1) the existence of a clear and definite promise which the promisor should reasonably expect to induce action by the promisee; (2) proof that the promisee acted to its detriment in reasonable reliance on the promise; and (3) a finding that injustice can be avoided only if the court enforces the promise.

*Parkhurst,* ¶ 21, 94 P.3d at 460 (quoting *City of Powell v. Busboom,* 2002 WY 58, ¶ 8, 44 P.3d 63, 66 (Wyo.2002)).

[¶ 92] This Court has also said, regarding application of promissory estoppel to avoid the statute of frauds:

> The party seeking to have the oral contract enforced must demonstrate a change of position "substantially for the worse" and the incurrence of "unjust and unconscionable injury and loss" before the invocation of estoppel can be successful. *Crosby,* 324 P.2d at 497 (holding, even though we spoke of estoppel in pais specifically, the rule generally applied to estoppel). In *Crosby,* we cited with approval *In re Bennett,* 115 Minn. 342, 132 N.W. 309, 311 (1911), in which the court said that change in position must be "of such character and to such an extent that the interposing of the defense of the statute would be a fraud."

*Davis,* 855 P.2d at 349.

[¶ 93] The Redland Children argue that the doctrines of both full performance and promissory estoppel preclude a statute of frauds defense in this case. They further contend that the statute of frauds should not apply to the oral agreements at issue in this case because they are not agreements for "the sale of real estate." We will address first this broader contention that the statute of frauds does not apply to the parties' agreements. We will then turn to the more particular consideration of the agreements themselves and application of the statute of frauds and its exceptions.

## A. *Application of Statute of Frauds Generally to Parties' Agreements*

[¶ 94] The statute of frauds bars enforcement of oral agreements for "the sale of real estate." § 1–23–105(a)(v). The Redland Children argue that the agreements with Robert Redland were not for the sale of real property but were instead transactions in which their father, based on the children's agreement to enter into the Trust Agreement and provide cash investments, acted as land broker. Based on this distinction, they contend that the statute of frauds does not apply to the agreements with their father. The Redland Children's argument is not supported by our decisions interpreting the statute of frauds.

[¶ 95] We have held that the statute of frauds applies beyond the literal sale of real estate to bar any oral agreement that purports to convey or affect an interest in real property. *See Hovendick,* 10 P.3d at 1124 ("[O]ral agreements changing known boundary lines violate the statute of frauds.") (quoting 6 Thompson on Real Property § 3035, p. 508 (1962)); *Fowler,* 933 P.2d at 504 ("The statute of frauds requires that every conveyance of real estate, or any interest therein, shall be in writing."). More specifically, this Court addressed the type of distinction for which the Redland Children are arguing in *Hoge v. George,* 27 Wyo. 423, 200 P. 96 (1921). In *Hoge,* the parties orally agreed to purchase ranch property together and to then share in the profits from the resale of that property. *Id.* at 97–98. This Court held that under such circumstances, the statute of frauds would not bar an action to recover profits from the resale of the property, but the statute would bar an action that sought to establish an interest in real property. *Id.* at 101. The Court explained:

> A different question would be presented if the plaintiff were seeking to recover an interest in the lands which had been acquired in the course of the joint enterprise instead of his share of profits which have arisen from the sale of them. Even though the contract be one which is in contravention of the statute, yet, when the transactions affecting the interests in the land have been completed, so that the court need not enforce anything with reference to the land itself, it has been held that

the rights of the parties resulting from their dealings may be enforced.

*Hoge,* 200 P. at 101.

[¶ 96] In the present case, the Redland Children are asserting an interest in the contested properties. The statute of frauds therefore applies unless one or both of the equitable doctrines precludes the statute's application.

## B. *Application of the Statute of Frauds and Equitable Exceptions*

■ [¶ 97] In this part of our opinion, we will first address the parties' execution of the Trust Agreement, the oral promises made concerning the property at that time, and whether those promises and the Redland Children's actions in reliance on those promises create genuine issues of fact regarding the application of the statute of frauds and its equitable exceptions. We will then discuss the agreements related to each separate property and the questions of fact regarding application of the statute of frauds to the individual properties.

### *Trust Agreement and Oral Agreement Related to All Redland Properties*

### *Clear and Definite Agreement*

[¶ 98] In determining whether an equitable exception to the statute of frauds precludes its application in this case, the first question that must be addressed is whether the Redland Children have presented evidence of a clear and definite agreement between the parties to convey the disputed property to the Redland Family Trust. *See Parkhurst,* ¶ 21, 94 P.3d at 460; *Hovendick,* 10 P.3d at 1124.

[¶ 99] In 1989, the parties executed the Trust Agreement. The agreement provided that all property held by the trust, and the income and profits from that property, would be maintained and operated for the beneficial members of the trust. Before executing the written Trust Agreement, the parties discussed the creation of the trust and their intentions regarding the trust and the Redland properties. In his affidavit in opposition to summary judgment, Kendrick Redland stated as follows concerning those discussions:

3. At the meeting about setting up the family trust, Dad said that each of kids contribute money from our CD's in order to secure and purchase all of the land that we were running our livestock on including the Farm at Manderson, the Woody Place at Ten Sleep, the Mountain Ground and the BLM & State grazing leases attached to those grounds. Bob made it very clear that all the ground we were running on would eventually go into the trust over time and if Eric (Pooch) Redlands' [sic] ground became available, his part of the mountain & slope, the State Farm or his ranch at Ten Sleep became available in the future, we needed to be in a position to acquire those also so that they could be put in the family trust we were setting up.

4. Rolly and I were concerned about having our houses on land we didn't own, but Bob made it clear that none of the land could be owned individually including where any of the houses sat, it would all have to go into the trust to make it legal. We agreed to that and decided to put money in based on his promises. By August of 1989 the trust was formed and signed by all of us kids and my parents.

[¶ 100] In his summary judgment affidavit, Rolly Redland gave a similar account of the discussions and promises surrounding the execution of the Trust Agreement:

9. Before August 10, 1989 a meeting took place between Rolly Redland, Kendrick Redland, Irene Redland and Robert Redland regarding the trust and what property would become part of the trust. The subject was about what, if any, property from Granddad's (Richard Redland, Sr.'s) estate or essentially all of the property that Granddad had acquired was going to end up in the trust. At the meeting, I asked repeatedly essentially "If I give up my equity, does that mean you will give up your equity." Robert replied "we all have to give up something to make this work." He also stated "A guy thinks just as much of his daughters as his sons, they need a little something too." I then responded "That's fine, but is everybody going in, are

you going to put property in this deal?" Robert replied, "yes, everybody's got to give up something and it is all going in (to the Trust), the farm and all of the property of Granddad's, is going into the Trust." * * * Before I signed the Trust Agreement and invested the money, Bob made it very clear that if we invested in the Trust, "all" of the property he owned from or was to acquire from the Richard Redland, Sr. Estate was "going into the Trust."

10. * * * Again, there were numerous meetings in which I was promised if I invested the $27,500.00 and signed on with the Trust, that all property from the Richard Redland Estate that my father had acquired or would acquire under his option in the future, including the property then currently owned by Robert Redland, would all be placed in the Family Trust. It was made very clear that the property which is not now in the trust but is the subject matter of this suit was to also be owned by the trust as repeatedly promised by my father.

\* \* \*

24. Likewise, I note from paragraph 9 of Robert Redland's Affidavit, he states: "My intention in including these provisions in the trust was to ensure that *the ranch owned by my parents would remain in our family forever, as I had promised my father.*" That statement is certainly consistent with his promise that all of the land owned by my Gran[d]dad, Richard Redland, Sr. would be placed in the Trust. That certainly verifies his promised intention in 1989 and 1992 when he asked us to be involved and pay our way into the Trust. [Underline in original.]

\* \* \*

39. I state with certainty that all of the lands under leases or deed or grazing allotments which we contend should be held in Trust, were lands which were formerly owned by Richard Redland, Sr. being those my father promised to place in the Trust so that they could continue to remain in the family. At the time the promise was made in 1989, it was very clear what was being promised and what lands would end up in the Trust. There is no doubt that in 1989, my father was describing all lands which we contend should have been placed in the Trust in the lawsuit.

[¶ 101] In contrast to the manner in which Rolly and Kendrick Redland describe Robert Redland's promises to place all Redland property in the Redland Family Trust, Robert stated as follows in his summary judgment affidavit:

12. I have never conveyed any of my separate real property interests to the Redland Family Trust and have no intention, now or in the future, of conveying my separate real property interests to the Redland Family Trust.

[¶ 102] The affidavits of Robert Redland and Rolly and Kendrick Redland present a factual dispute as to what Robert promised when the Trust Agreement was executed. Nonetheless, while there may be a dispute, the Redland Children have presented evidence of a clear and definite agreement: In exchange for the Redland Children signing and committing to the Trust Agreement and contributing cash, all of the Redland property would be placed in the trust and managed for the benefit of the trust.

### Full or Substantial Part Performance

[¶ 103] The next question is whether the Redland Children performed their obligations pursuant to that agreement, in full or substantial part. *Hovendick*, 10 P.3d at 1124. The evidence is undisputed that each of the five Redland children signed the Trust Agreement and contributed an initial $27,500 to the Trust in 1989. In 1992, each of the five children made an additional contribution of at least $13,000, with Kendrick Redland contending his additional contribution exceeded that amount and was instead $40,000, and Rolly Redland contending that his 1992 contribution was $60,000. While the amounts of the cash contributions may be disputed, the Redland Children have presented evidence that they fully performed under their agreement with Robert Redland.

### Detrimental Reliance

[¶ 104] The final question is whether the Redland Children acted in reliance on the

agreement to their substantial detriment. *Parkhurst*, ¶ 21, 94 P.3d at 460; *Hovendick*, 10 P.3d at 1124. On this question, the Redland Children have again presented evidence through the summary judgment affidavits of Rolly and Kendrick Redland. In his affidavit, Kendrick states:

> 8. Rolly and I spent all of our lives and later our wives, Sharon & Deb, invested our lives & money in building and continuing the ranching operation that our Grandparents started so that we can pass it on debt free as one solid ranching unit. We did this on Trust property. This labor and money devoted to the family ranch, included the lands we recently found out were not in Trust.

[¶ 105] Rolly Redland's affidavit was to similar effect. Rolly stated as follows concerning the Redland Children's reliance on Robert Redland's promises:

> 28. My siblings and I relied upon the promises from Robert Redland that all of the property would be placed into the Family Trust. Based upon those promises in 1989 and 1992 we allowed hundreds of thousands of dollars to leave our collective hands, Rolly, Kendrick, Roalene, and Teresa so that Robert Redland could purchase the property he represented would be placed into the Family Trust. Those representations caused us not only to invest money to purchase these lands on behalf of the Trust, but to make thousands of dollars of improvements and maintain these properties with little return. We did this with the thought and belief that the will of the Trust was being carried out. * * *
>
> * * *
>
> 33. I have spent thousands of dollars of my own money making improvements to Trust property and non-Family Trust lands because I believed Robert Redland's promises that he was going to put all property he owned or received from Richard Redland's Estate, and Eric Redland's Estate into the Family Trust. I have received almost no return from the Trust, and have not received any wages from the Trust since 1989. I believe the report of economist Paul Burgener to be true that between my brother and his wife and my-

self and my wife, we have contributed at least $4,284,419 to the entire Redland Family Ranching operation we believed was fully encompassed within all of the Trust lands including the lands we believed to be family Trust lands which we now know are not part of the Family Trust. When we spent time and money on those lands, we relied upon the promises of my father, and believed that all of those lands were Family Trust lands. We never separated those lands out of the Family Trust Ranching operation. Robert Redland certainly did not object to the significant investment we made when he took the income from the Family Trust operation for his own use. In essence, he stood by while we injected millions on what is now known as non-trust lands without his objection, while he reaped the benefits.

[¶ 106] The Redland Children have presented sufficient evidence to create a disputed issue of fact concerning the existence of a clear and definite oral agreement, their performance under that agreement and their reliance on the agreement. *See Hovendick*, 10 P.3d at 1124 (reversing summary judgment and finding disputed issues of fact regarding statute of frauds where evidence showed that party claiming oral agreement took possession of their half of disputed land, fenced on newly established boundary line, cleared brush and planted grass seed for pasturing horses, and paid taxes). These disputed issues of fact must be resolved by a trier of fact to determine whether the equitable exceptions to the statute of frauds, either promissory estoppel or full or substantial partial performance apply in this case.

[¶ 107] Because of the disputed issues of fact in this case, we conclude that Robert Redland's reliance on this Court's statute of fraud rulings in similar familial promise circumstances is again misplaced. In *Parkhurst*, we found that the alleged oral agreement between a mother and her son and daughter-in-law was not a clear and definite agreement, but was instead no more than an agreement to agree. *Parkhurst*, ¶ 19, 94 P.3d at 459 ("At most, Parkhurst and Boykin entered into an "agreement to agree" that Parkhurst would consider a transfer of a 49%

interest in the Huston Ranch at some future time.").

[¶ 108] In *Fowler*, a son alleged an oral agreement by his father to convey ranch property and testified that in exchange for leaving his employment in Colorado, he was to receive a monthly salary of $2,000 and the ranch when his father died. *Fowler*, 933 P.2d at 505. The son also testified, however, that at times he would forego his monthly salary and use that to instead build equity in the real property. *Id.* Based on the son's conflicting testimony regarding the promise to receive the property on his father's death and his need to build equity in that property, as well as the son's testimony in a separate divorce proceeding disclaiming any equity interest in the ranch, we rejected the assertion of a clear and definite oral agreement to convey the ranch property. *Id.*

[¶ 109] Finally, in *Davis*, we rejected a son's assertion of an oral agreement by his mother to convey ranch property, again because of the uncertainty of the oral agreement. In particular, although the son claimed that his mother had promised the ranch property to him when he completed payments on the outstanding mortgage, the mother thereafter used the property and made partial conveyances of the property as she pleased and without objection by the son. *Davis*, 855 P.2d at 349–350. These circumstances undermined the son's assertion of a certain and definite agreement to convey the ranch property. *Id.*

[¶ 110] The present case does not present similar ambiguities in the certainty of the alleged oral agreement to convey real property. The Redland Children have presented disputed but unequivocal evidence of a certain and definite agreement to convey property. It is for the trier of fact to resolve the disputed issues of fact relating to the statute of frauds and the equitable exceptions to the statute.

### Additional Questions of Fact Relating to Individual Property Disputes

[¶ 111] The questions of fact that we have highlighted in relation to the general alleged agreement to convey property in this case are compounded when each property is reviewed individually. One particular concern we have with regard to certain individual property conveyances relates to the written evidence of the transaction. As we will discuss in greater detail hereafter, where a conveyance is documented by a written agreement or conveyance, it may be that what is at issue is not application of the statute of frauds, but rather an interpretation or construction of the written agreement or conveyance.

[¶ 112] We turn then to the individual properties and the more specific fact issues related to each.

### Original Mountain Land

[¶ 113] The Original Mountain Land was the first property conveyed to the Redland Family Trust, and its conveyance was the only one specifically provided for by the Trust Agreement. This is also the first property that we identify as one for which it is unclear whether resolution of the dispute truly involves enforcement of an oral agreement or is a question of the interpretation or construction of a written property conveyance.

[¶ 114] The deeded portion of the Original Mountain Land and its associated BLM allotments are not contested. The disputed portion of the property is the associated state lease, State Lease No. 3–8195.

[¶ 115] In his summary judgment affidavit, Robert Redland described how the Redland Family Trust acquired the Original Mountain Land:

The original mountain land came to be owned by the Redland Family Trust through the following chain of events. I was given the right, through my father's will, to purchase a two-thirds (2/3) interest in my father's mountain grazing land from my father's estate after my mother passed away. My brother, Eric Redland, was given the option to purchase the remaining one-third (1/3) interest. See Last Will and Testament of Richard Redland, marked Exhibit "B". In March of 1983, I purchased Eric Redland['s] option for consideration of $100,000. See Assignment of Eric Redland, marked Exhibit "C". I thereafter as-

signed part of the option to my wife, Irene, and together we assigned a 1/7th interest to each of our five children. See Assignments marked Exhibit "D". Irene and I along with our five children assigned the option to the Redland Family Trust. See Redland Family Trust, marked Exhibit "E". The parties to the trust then exercised the right to purchase the original mountain land and it was conveyed to the Trust. See the Warranty Deed and Corrective Deed attached hereto as Exhibit "F".

[¶ 116] As indicated in Robert Redland's affidavit describing the trust's acquisition of the Original Mountain Land, the purchase option originated in the will of Robert's father, Richard Redland, Sr. That will described the purchase option as follows, with our emphasis added:

1. I give and devise to my wife, NELLIE M. REDLAND, a life estate in any and all lands which I may own in Township 45 North, Ranges 85, 86 and 87 West of the 6th P.M. With respect to the remainder in such lands, or if my wife shall not be living at my death, then I hereby direct and it is my wish that my sons, ROBERT REDLAND and ERIC REDLAND, shall have the right to purchase all interest in such lands as follows:

*ROBERT REDLAND shall have the right to purchase a two-thirds interest and ERIC REDLAND shall have the right to purchase a one-third interest, but if either shall fail to purchase as provided herein, the other shall have the right to purchase all of said lands. Any Taylor Grazing allotments used in connection with said lands and the State of Wyoming lease covering Section 16, Township 45 N., Range 86 W. of the 6th P.M. are to go with the land without charge. The price shall be $27.50 per acre and shall be payable one-sixth down upon exercise of the right, and the balance shall be payable in five equal, annual installments.* The deferred purchase price shall bear interest at the same

rate of interest which The Stock Growers State Bank at Worland, Wyoming, shall be paying currently on one-year time certificates of deposit as of the date of my death. The right to purchase shall be exercised in writing within six months of the death of my wife, or after my death, whichever is later, and shall be delivered to the Executor of the estate of the survivor of myself and wife. If said lands shall not be purchased by my two sons, or either of them, as provided herein, then such lands, after termination of the life estate of my wife, shall become a part of the remainder of my estate. [Emphasis added.]

[¶ 117] Based on the purchase option as described in Richard Redland, Sr.'s will, the option appears to have included the deeded land, the BLM grazing allotments, and the now contested state lease. However, beginning with Robert Redland's purchase of his brother Eric Redland's share of the purchase option in 1983, it appears that Robert took steps to separate the state lease from the rest of the Original Mountain Land. Specifically, in the recorded assignment from Eric Redland to Robert Redland of Eric's share of the purchase option, the assignment breaks the assigned property into two paragraphs, with the first paragraph listing the state lease and the second paragraph listing the purchase option, which is described to include only the deeded lands and the BLM grazing allotments.

[¶ 118] Thereafter, when Robert Redland assigned interests in the purchase option to his wife and children, those assignments referenced an "Exhibit A," which purported to describe the property included in the purchase option, and which we assume, but do not know, described the property without reference to the state lease.[4] In any event, as explained in Robert Redland's affidavit, after he assigned his interest in the purchase option equally among his wife and children, each family member transferred their portion of the purchase option to the Redland Family Trust. The Trust Agreement re-

---

4. The copies of the assignments in the summary judgment record did not have the attached "Exhibit A," and there is thus a gap in the record.

flects this transfer as follows, again with our emphasis added:

> Each of the above named parties transfers to this trust their interest in the *options to purchase from the Estate of Richard Redland, Sr. .*[sic] *the lands described in Exhibit A annexed hereto* subject to any indebtedness on said options and lands and the sum of $27,500.00. [Emphasis added.]

[¶ 119] Exhibit A to the Trust Agreement describes the land included in the purchase option as the deeded land and the BLM allotments. The property description makes no reference to the state lease. Finally, the Warranty Deed by which the Original Mountain Land was conveyed to the Redland Family Trust includes a property description that includes the deeded land and the BLM allotments but does not reference the state lease.

[¶ 120] Based on the summary judgment record, we are left with a number of questions, both legal and factual, regarding the Original Mountain Land and the parties' agreement that it would be conveyed to the Redland Family Trust. Because the district court's summary judgment ruling curtailed a careful review of the property transactions, many of these questions have not been addressed by the district court or the parties. In identifying the questions, we will not attempt to answer them because they entail legal and factual questions that should first be addressed on remand by the parties and the district court.

[¶ 121] Our first question relates to the manner in which Robert Redland separated the state lease from the deeded land and BLM allotments described in the purchase option bequeathed by his father. An option is an offer to contract that is strictly construed, and the exercise of an option, being the equivalent of an acceptance, must be done precisely in keeping with the option's terms. *Bennett v. Foust,* 996 P.2d 693, 697 (Wyo.2000); *Bidache, Inc. v. Martin,* 899 P.2d 872, 874 (Wyo.1995); *Crockett v. Lowther,* 549 P.2d 303, 310 (Wyo.1976). Given this clear precedent, we question whether Robert Redland could legally separate the state lease from the deeded land and BLM allotments when he assigned interests in the purchase option, since it appears the option was defined by Richard Redland, Sr.'s will to include all of the property, including the state lease.

[¶ 122] Our next question is whether the Trust Agreement is ambiguous with regard to the option to purchase the Original Mountain Land. The Trust Agreement references the purchase option as described in Richard Redland, Sr.'s will and then also references what appears to be a conflicting property description in its attached "Exhibit A." We thus question whether the discrepancy in property descriptions rendered the Trust Agreement ambiguous, allowing for the admission of parol evidence concerning the parties' discussions and negotiations. *See Ultra Res., Inc. v. Hartman,* 2010 WY 36, ¶ 23, 226 P.3d 889, 905 (Wyo.2010) ("Parol evidence of the parties' intent regarding what particular terms in their agreement mean is considered only when the contract is ambiguous.").

[¶ 123] On a similar note, we have held that in interpreting written agreements, a determination of the parties' intentions, which is our paramount concern, may require consideration of the context within which the contract was made. *Davison v. Wyo. Game & Fish Comm'n,* 2010 WY 121, ¶ 9, 238 P.3d 556, 560 (Wyo.2010). Even if a written agreement is clear and unambiguous, a reviewing court may look to the circumstances surrounding the contract, as well as its subject matter and the purpose of the contract to glean the intent of the agreement. *Id.* In this respect, even if the trier of fact were to find the Trust Agreement to be clear and unambiguous, the record contains evidence of circumstances surrounding the agreement's execution that might inform the trier of fact's interpretation and lead to a conclusion that the Trust Agreement's clear language included the state lease as part of the Original Mountain Land conveyance.

[¶ 124] In particular, the record contains evidence that the BLM considered the deeded mountain lands combined with the state lease to be the base property for the BLM allotments. The record also contains evidence that Richard Redland, Sr. desired that the property remain intact and in his family.

As Robert Redland stated in his summary judgment affidavit:

> 9. The trust also restricts the parties' ability to transfer, sell, or otherwise dispose of their interest through a preemptive right clause, and the document also contains a provision that upon the death of any beneficial owner, his or her interest in the trust estate shall pass to his or her children, or descendants of any children. My intention in including these provisions in the trust was to ensure that the ranch owned by my parents would remain in our family forever, as I had promised my father. See Redland Family Trust marked Exhibit "A".

[¶ 125] These questions of contract interpretation and construction are what cause us to question whether the statute of frauds is even a consideration in regard to the conveyance of the Original Mountain Land. The conveyance is documented by the written purchase option, the written Trust Agreement and by a recorded warranty deed. It appears that the question before the district court may require consideration of the written agreement rather than a determination of whether the statute of frauds bars enforcement of an oral agreement. Again, we find it premature for this Court to declare that approach as the required resolution on remand. We instead point out the question and some of the evidence in dispute to further illustrate the additional questions of fact that precluded summary judgment on the issue of whether the Redland Children's property claims are barred by the statute of frauds.

### State Farm at Manderson (State Lease No. 3–8179)

[¶ 126] The next disputed property is the State Farm at Manderson, or State Lease No. 3–8179. This dispute does implicate an oral agreement to convey property to the Redland Family Trust. The State Farm at Manderson is one of two properties that Robert Redland purchased from the estate of Eric Redland in 1992. Robert purchased the State Farm in his individual capacity, and the property was conveyed by deed to him in his individual capacity. He also purchased in his capacity as trustee to the Redland Family Trust the property known as the Additional Mountain Land. That land was conveyed by deed to the trust and is not in dispute.

[¶ 127] Robert Redland contends that there was no oral agreement between the parties that the State Farm at Manderson would be purchased for the trust. He further contends that he purchased the property for himself using his own personal funds. The Redland Children contend that they gave Robert funds to purchase both properties and submitted the following evidence on summary judgment that is particular to this property:

—Of the seven members of the trust, five contributed $13,000 each toward the purchase of property from Eric Redland's estate, Kendrick Redland contributed $40,000 and Rolly Redland contributed $60,000;

—The amount contributed by the trust members to purchase property from Eric Redland's estate far exceeded the amount that would be required to purchase just the Additional Mountain Property;

—Robert Redland rejected a suggestion by Rolly Redland that Rolly purchase the State Farm at Manderson as a location on which to build his own home, explaining to Rolly that the property had to go into the family trust with the rest of the property; and

—Rolly and Kendrick Redland made substantial improvements to the State Farm at Manderson believing that the property was in the family trust.

[¶ 128] Again, we identify this evidence to illustrate the factual disputes related to this particular property that precluded summary judgment on the statute of frauds question. That said, these are some disputed facts, but we do not intend for ours to be a complete and exhaustive listing of all of the disputed facts.

### State Lease at Woody Place (State Lease No. 3–8248)

[¶ 129] The State Lease at Woody Place is another of the disputes that may be resolved by interpretation of a written convey-

ance. The deeded property at Woody Place is not in dispute and was conveyed to the Redland Family Trust in 1995. What is in dispute is the property's associated state lease, State Lease No. 3–8248.

[¶ 130] As with the Original Mountain Land, the conveyance of Woody Place to the trust began with Robert and Irene Redland first gifting to each of their children a one-seventh interest in the property. That transaction is documented with warranty deeds. The trust members then in turn conveyed Woody Place to the trust through warranty deeds that provided, in part, with the emphasis in the original:

> WITNESSETH, That the Grantor, for and in consideration of the sum of Ten and no/100 Dollars ($10.00) and other good and valuable consideration, in hand paid, the receipt of which is hereby acknowledged, does, by these presents, grant, bargain, sell, **CONVEY AND WARRANT** unto the said Grantees, the following described real estate, together with all improvements, appurtenances and water rights thereto belonging, situate in the County of Washakie, State of Wyoming, to—wit;
>
> An undivided one-seventh interest as a tenant in common in the property described in Exhibit "A", which is attached hereto and by this reference incorporated herein.

[¶ 131] Exhibit A to each warranty deed contained an identical property description, which description did not include a reference to State Lease No. 3–8248, that is, the State Lease at Woody Place. The Redland Children contend that it was their intention and understanding that the conveyance of Woody Place to the Redland Family Trust included State Lease No. 3–8248, while Robert Redland contends that the lease was never part of the conveyance or promised as property that would be conveyed to the trust.

[¶ 132] We again do not dictate how the district court resolves the questions of fact that relate to this particular property dispute, whether that be by interpretation of the written conveyances or by a determination of the statute of frauds question. Here we simply identify the evidence showing the factual disputes specific to this property that may be relevant to either approach:

—When Robert and Irene Redland originally purchased Woody Place from Robert Redland's parents, Richard and Nellie, Robert's parents included an assignment of State Lease No. 3–8248 at no additional charge;

—State Lease No. 3–8248 holds the water required for the operations on Woody Place;

—Rolly Redland's affidavit testimony that because the water from the state lease is critical to his operations on Woody Place, he would not have agreed to convey his interest in Woody Place if he did not already understand based on Robert Redland's prior assurances that State Lease No. 3–8248 was already held by the trust; and

—The 1995 amendment to the Trust Agreement, which added a Section Fourteen to the agreement, providing:

> All B.L.M., Forest Service, and State leases and/or grazing permits added to the assets of the Trust shall remain the property of the Trust unless and until a three-fourths (3/4) majority of the beneficial owners of the Trust estate agree in writing to the removal of the B.L.M., Forest Service and State lease and/or grazing permit from the assets of the Trust.

[¶ 133] Again, whether the district court on remand approaches the question as one of document interpretation or as a statute of frauds question, the disputed evidence makes it clear that the question was not one to be resolved by summary judgment.

### *Manderson Place*

[¶ 134] The final disputed property is Manderson Place, which is deeded property titled in Robert Redland's name individually or in his separate individual trust. It appears that the BLM allotment associated with this property, that is the Lower Nowood Allotment is also in dispute. There are no written conveyances of the Manderson Place property or its BLM allotment to the Redland Family Trust, and this dispute is therefore one that requires enforcement of an oral

agreement and a determination of whether the statute of frauds bars enforcement of such an agreement. The additional evidence that creates a factual dispute relating to this property in particular is the following:

—The brands of Rolly, Kendrick, and Robert Redland are all listed by the BLM as authorized brands to run and pasture on the Lower Nowood Allotment; and

—Kendrick Redland made substantial improvements to Manderson Place based on his understanding and belief that the property was held by the Trust.

[¶ 135] With respect to the Redland properties as a whole and Robert Redland's alleged oral agreement to convey all of the property to the Redland Family Trust, and with respect to the individual property transactions, the complexity of the facts and the disputed evidence makes a summary judgment disposition of Redland Children's property claims simply impossible. We therefore remand for a trial on the property claims, including the questions of whether those claims are barred by the statute of limitations or the statute of frauds.[5]

### B. *Robert Redland's Appeal from Unjust Enrichment Ruling*

[¶ 136] Following a bench trial, the district court ruled in favor of the unjust enrichment claims of Rolly Redland and Kendrick Redland. The court awarded $14,040.00 to Rolly for his improvements to the State Farm at Manderson, and it awarded $28,737.00 to Kendrick for his improvements to the Manderson Place. Robert Redland appeals the district court's ruling arguing that the court erred both in finding that Rolly and Kendrick had proved the required elements of their claims and in the amount of damages it awarded.

### *Proof of Unjust Enrichment Claims*

[¶ 137] Unjust enrichment is an equitable remedy. *Schlinger v. McGhee*, 2012 WY 7, ¶ 25, 268 P.3d 264, 272 (Wyo.2012); *Jacoby v. Jacoby*, 2004 WY 140, ¶ 13, 100 P.3d 852, 856 (Wyo.2004). We have defined unjust enrichment and its required elements as follows:

Unjust enrichment is the unjust retention of a benefit to the loss of another. It exists as a basis for recovery for goods or services rendered under circumstances where it would be inequitable if no compensation was paid in return. In Wyoming, the elements of unjust enrichment are: 1) valuable services were rendered; 2) to the party to be charged; 3) which services were accepted, used and enjoyed by the charged party; and 4) under circumstances that reasonably notified the party being charged that the other party would expect payment for the services. *Horn v. Wooster*, 2007 WY 120, ¶ 24, 165 P.3d 69, 76 (Wyo.2007); *Jacoby v. Jacoby*, 2004 WY 140, ¶ 10, 100 P.3d 852, 855 (Wyo. 2004)

*Schlinger*, ¶ 23, 268 P.3d at 272.

[¶ 138] Because unjust enrichment is an equitable remedy, the decision to grant such relief is committed to the district court's discretion. *Jacoby*, ¶ 7, 100 P.3d at 855. We thus refine our earlier stated standard of review to include the abuse of discretion standard by which we must review the district court's decision to grant equitable relief:

We have said that an appropriate exercise of discretion occurs when " 'conclusions [are] drawn from objective criteria, [and] sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.' " *In re Worker's Compensation Claim of Shryack*, 3 P.3d 850, 855 (Wyo.2000) (*quoting Vaughn v. State*, 962 P.2d 149, 151 (Wyo.1998)).

"A court does not abuse its discretion unless it acts in a manner [that] exceeds the bounds of reason under the circum-

---

5. Based on the foregoing discussion, we reject Robert Redland's parol evidence argument. As noted in Robert Redland's brief, this argument was not presented to the district court in the first instance. In light of our ruling on the summary judgment issues, we conclude that the parol evidence objection is the type of objection that must be made first to the district court in the context of the evidence being offered and whether the evidence is being offered to aid in the interpretation or construction of a written agreement.

**1204**

stances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances."

*Roberts v. Roberts,* 816 P.2d 1293, 1297 (Wyo.1991) (*quoting Martinez v. State,* 611 P.2d 831, 838 (Wyo.1980)).

*Jacoby,* ¶ 9, 100 P.3d at 855.

[¶ 139] The district court found that Kendrick Redland had made improvements to the Manderson Place by placing a mobile home on the property with an addition and outbuildings, installing utilities, and building corrals and a feedlot. The court found that Rolly Redland had made improvements to the State Farm at Manderson by improving the road, building new calving sheds, building fences and hooking a hydrant to a water line. The district court found these improvements justified unjust enrichment awards to Kendrick and Rolly, based on the following findings:

The Court finds that each of these elements was established by the evidence. Certainly the improvements were and are valuable. They are valuable to Robert Redland because they enhance the value of his land. Furthermore, they were valuable to him because they enabled all of the family operations, including Robert's, to continue. The evidence showed that at times each of the three (Robert, Rolly and Kendrick) assisted the other, worked together and utilized the improvements in some way. Those joint efforts would not have been possible without these improvements.

The improvements were more useful in the short term to Rolly and Kendrick than to Robert, but nevertheless they were valuable, used and enjoyed by Robert. The Court finds it disingenuous for Robert to claim that Kendrick and Rolly made these improvements solely for their own individual benefit. The facts show that until Irene's death, all parties thought the land was part of a joint family enterprise that benefitted everyone.

The circumstances here reasonably notified Robert that Rolly and Kendrick expected to be compensated for the improvements. Each of them inquired about contributions to the Trust, and Robert told them that the land was going into the Trust. These improvements are permanent in nature. Although they could be physically removed, they obviously are intended to stay, are not portable, and likely cannot be removed without damage and significant expense. No one would reasonably believe Rolly or Kendrick would install such improvements without expecting to be compensated.

[¶ 140] Robert Redland does not dispute that Rolly Redland and Kendrick Redland made the improvements to Manderson Place and the State Farm at Manderson. He instead contends that the improvements were not of value to him and were not accepted by him. He further contends that Rolly and Kendrick failed to prove the fourth element of their unjust enrichment claims because neither son requested or expected payment for the improvements, and the circumstances were not such that would reasonably put Robert on notice that his sons would expect payment. We disagree, and find no clear error or abuse of discretion in the district court's unjust enrichment findings.

[¶ 141] With regard to Kendrick Redland's claim for improvements made to Manderson Place, Sharon Redland testified:

A. When we went to build the feedlot, Bob had no problem with us putting the money in to build the feedlot, none whatsoever. "That will be good. You can feed stuff there, and it won't cost us to go to a feedlot," he said.

\* \* \*

A. When I went to put my addition on my house in 2004, I talked to Bob and Irene, and I said, "Are we going to be here? I don't want to put up a foundation if I am not going to be here." And they said, "Yes, you are going to be here. It's all you guy's; it's all ours. Yes, you are going to be here." I asked them.

[¶ 142] With regard to Rolly Redland's claim for improvements made to the State

Farm at Manderson, Rolly provided testimony describing the improvements to the property and conversations with Robert Redland regarding those improvements. Regarding the improvements to the road, Rolly testified:

A. I hired Nowood Construction, first of all, to—and it was State gravel, State land, State gravel, it came out of the pit on the farm—to come in and regravel, lay a road base and pack the road from Highway 579—Highway 31, I am sorry—Highway 31 to the farmstead, and then fill the farmstead barn lot, using area, completely level so that the water would drain out.

\* \* \*

Q. Let's go back to the issue about the road. I didn't ask you the same question. The road, did you talk to your father about putting the road in before you had done that?

A. Yes.

Q. If you can, tell the court about that conversation.

A. Well, first of all, I told him this road is the pits. I mean, there is holes in it. It's a miserable bugger to drive from the mailbox to the house; and from the house to the loading chute, when it rained a duck could swim from one side to the other. You couldn't even get in there with a big truck. And he told me, "Well, dad and Eric, brother Eric, and I, we have graveled it many times. It will never work." And I said, "Well, I think I can put in a road here and base that's going to hold." "Well, okay." And he stood right there all day long while those belly dumps were running.

[¶ 143] Regarding the calving shed, Rolly Redland testified:

Q. Can you describe the building?

A. It's an open face shed about 16 feet deep and about 120 feet or 140 feet long.

Q. Okay. Did you talk to your father about doing that before you had done it?

A. Yes, I did.

Q. Can you tell the Court about that conversation?

A. I told him that I had to have something here to calve these earlier, had to have something, and he and mom both asked me, "Well, why don't you just use the corrals that are on the place?" And I said, "Well, first of all, the corrals are way too little, and you want to use them; but, you know, you got to come and go through these corrals. They are too little. I can't get in them. I can't clean them, and there is one little bitty corner there, and I don't want to do that. I want to put up a building and a corral to take care of business there."

Q. How did your dad respond to that?

A. He said, "Okay, that's fine. I will notify the state and put it on the form."

[¶ 144] Rolly Redland further testified that the road improvement worked, and everyone, including Robert Redland, used the road. He also testified that both he and Robert used the calving shed. The testimony of Rolly concerning the improvements to the State Farm at Manderson, and the testimony of Sharon Redland regarding the improvements to the Manderson Place, are not the entirety of the evidence on the unjust enrichment claims, but their testimony provides an example of the testimony the Redland Children presented to show that Robert Redland knew of the improvements, accepted the improvements, and benefitted from the improvements. The record thus supports the district court's findings, and we can discern no basis for finding a clear error or an abuse of discretion.

[¶ 145] We turn then to Robert Redland's argument that Rolly Redland and Kendrick Redland have no claim for unjust enrichment because they did not demand payment and the circumstances were not such as would reasonably put Robert on notice that they expected payment. This argument is unsupported by both the evidence and this Court's analysis of the fourth component of an unjust enrichment claim, and we thus reject it.

[¶ 146] Our analysis of the fourth element of an unjust enrichment claim does not rest on an express demand for payment. Instead, we have said:

Element four is the heart of an unjust enrichment claim. The receipt of a benefit must be unjust as to the party to be

charged. Unjust enrichment is an equitable remedy that is appropriate only when the party to be charged has received a benefit that in good conscience the party ought not retain without compensation to the party providing the benefit. "The words 'unjust enrichment' concisely state the necessary elements of an equitable action to recover money, property, etc., which 'good conscience' demands should be set over to the appellee by appellants pursuant to an implied contract between them." *Landeis v. Nelson,* 808 P.2d 216, 218 (Wyo.1991). As stated at 66 Am. Jur.2d *Restitution and Implied Contracts* § 8 (2001):

> "The phrase 'unjust enrichment' is used in law to characterize the result or effect of a failure to make restitution of, or for, property or benefits received under such circumstances as to give rise to a legal or equitable obligation to account therefor. It is a general principle, underlying various legal doctrines and remedies, that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly."

*Boyce [v. Freeman],* 2002 WY 20, ¶ 15, 39 P.3d at 1065–66.

*Jacoby,* ¶ 13, 100 P.3d at 856.

[¶ 147] The district court's conclusion that Robert Redland could not reasonably believe that his sons would make such improvements to the Manderson properties without an expectation of compensation, stemmed from the court's finding that Robert had promised to convey both properties to the Redland Family Trust. The court looked for a reason that the sons would make substantial improvements to the property and found the answer in their expectation that the trust gave them an ownership interest in the property. The court emphasized its reasoning during trial when it overruled an objection by Robert's attorney to testimony that the court elicited concerning Robert's promises to convey the property and the Redland Children's reliance on those promises:

> [Counsel]: May I interpose an objection? First, everything that she has just testified to was part and parcel of the summary judgment.
>
> THE COURT: Counsel, it was not, because the summary judgment had to do with placing land into the trust. This has to do with whether or not they are entitled to reimbursement for property of a permanent nature that's placed on this property that the summary judgment ruled was not in the trust; and that's why I am asking. I would need to know why somebody would do that, and it makes a difference from a legal point of view to me. It does. So your objection is noted and overruled.

[¶ 148] The record supports the district court's reasoning. Rolly Redland and Kendrick Redland both testified that the permanent improvements made to Manderson Place and the State Farm at Manderson were made based on Robert Redland's promises that the property was owned by the Redland Family Trust. Robert Redland denied any such promises. But on the question of whether Robert promised that the property would be conveyed to and held by the trust, the district court believed Rolly and Kendrick and found that Robert's testimony lacked credibility:

> Later, in 1992, the children contributed additional funds to the Trust so it could purchase land interests held by an Uncle's estate. The purpose of these acquisitions was to consolidate all of the family's ranching and farming operations in the Trust. Rolly and Kendrick specifically claimed that these contributions were to assist in obtaining the farm known as the "State Lease." The Court finds their testimony credible and consistent with other facts in the case. Robert Redland disputed that the State Lease (or anything other than the Mountain Property) was to be placed in the Trust and pointed to tax return information to support his position. The Court finds the testimony of Robert Redland lacking credibility and inconsistent

with the other facts in the case. The Court generally finds that tax returns were prepared by accountants without knowledge of the actual working relationships between the parties. Finally, the Court recognizes that Judge Sullins granted partial summary judgment against Plaintiffs on their claims that Robert should be required to transfer the State Lease (and the Manderson Place) into the Trust. That ruling was based upon the statute of limitations and the statute of frauds, and did not constitute a finding contrary to the facts presented by Rolly and Kendrick.

[¶ 149] The district court's analysis of the compensation element of the sons' unjust enrichment claims went to what we have called the "heart" of an unjust enrichment claim. See Jacoby, ¶ 13, 100 P.3d at 856. The essence of the court's ruling was that Robert Redland, the party to be charged, received a benefit in the form of substantial improvements to his property, that in good conscience he "ought not retain without compensation to the party providing the benefit," that is, his sons. Id.

[¶ 150] The district court's finding of unjust enrichment under these circumstances is also supported by other authorities that have addressed similar circumstances. In one law review article on the topic of mistaken improvements to property, the author addressed this type of situation with the following hypothetical scenario:

Case 3: X builds a house on land purchased pursuant to an oral contract that is unenforceable under the Statute of Frauds.

This case presents another mistake of law, the unenforceability of the contract for the sale of the land. Although such cases generally are not remediable under the betterment statutes because the improver cannot show color of title, other means of relieving the improver's plight exist.

Kelvin H. Dickinson, *Mistaken Improvers of Real Estate*, 64 N.C. L. Rev. 37, 56 (1985–1986).

[¶ 151] This scenario's author cited to a New Jersey case that held that under this type of circumstance, the proper remedy for the mistaken improver would be a claim for unjust enrichment. See Heim v. Shore, 56 N.J.Super. 62, 151 A.2d 556, 563 (N.J.Super.Ct.App.Div.1959). In *Heim*, the plaintiff brought alternative claims for specific performance and unjust enrichment, based on an alleged oral agreement with the defendant for the conveyance of property on which the plaintiff had made substantial progress toward completion of a home. Id. at 557, 560. On appeal, the New Jersey court affirmed the lower court's finding that the oral agreement was not sufficiently certain to avoid the statute of frauds, and then concluded that relief was available to the plaintiff on the unjust enrichment claim:

> If it is determined that the parties did in fact have an intention to be bound by an agreement (as plainly appears to be the case) but that the agreement which they intended is unenforceable for uncertainty in terms (as already concluded), the defendants have a duty to pay for whatever value they have received from plaintiffs' partial performance, regardless of the absence of proof of the defendants' lack of good faith in permitting the services to be rendered. 1 Corbin, op. cit., *supra*, § 99, p. 314, § 102, pp. 322–23; 1 Williston, op. cit., *supra*, § 49, p. 158, text at n. 16; Annotation, 92 A.L.R. 1396, 1400–01 (1934); 98 C.J.S. Work and Labor § 30, p. 759.

*Heim*, 151 A.2d at 563.

[¶ 152] That was the status of the present case when the district court made its unjust enrichment ruling. The Redland Children's property claims had been held barred by the statute of frauds, but the court had made a finding that an oral agreement did exist between the Redland Children and Robert Redland to convey the property to the Redland Family trust. Under those circumstances, the district court correctly concluded that unjust enrichment was a remedy available to the Redland Children.

[¶ 153] We find no clear error or abuse of discretion in the district court's ruling on the elements of the Redland Children's unjust enrichment claims. We turn then to the damages the court awarded on those claims.

**1208** 

### Damages Awarded for the Unjust Enrichment Claims

██ [¶ 154] Robert Redland contends that even if the district court properly ruled that Rolly and Kendrick Redland established the elements of unjust enrichment, the amount of damages the court awarded was in error. Damages are ultimate findings of fact, and we thus review this claim of error under the same standard of review we use in reviewing other factual findings after a bench trial. "Damages, like apportionment of fault, are reviewed as fact and are not reversed unless clearly erroneous." *Cross v. Berg Lumber Co.*, 7 P.3d 922, 928 (Wyo.2000) (quoting S. Childress, *A Standards of Review Primer: Federal Civil Appeals*, 125 F.R.D. 319, 330 (1989)).

[¶ 155] At the close of the trial, the district court requested written submissions from each side on the value of the improvements made by Rolly Redland and Kendrick Redland. Both parties submitted written valuation reports, and the court determined damages based on those reports. With respect to Kendrick's improvements, the court accepted the valuation set forth in Robert Redland's report for the value of the home Kendrick placed on the property ($14,508), and it accepted the valuation Kendrick's report provided for the value of the feedlot ($14,239). With respect to Rolly's improvements, Robert submitted no valuation, and the court accepted Rolly's report, which valued Rolly's improvements at $14,040.

[¶ 156] With respect to the award to Kendrick Redland, Robert Redland does not object to the amount awarded for the home, but he does object to the feedlot valuation because the valuation report does not indicate that the amount was calculated taking into consideration the labor and materials Robert contributed to the construction of the feedlot. With respect to the award to Rolly Redland, Robert's objected to the valuation because "[i]t is difficult to determine what information the appraiser relied on to determine the value he ascribes to Rolly's improvement,"

fails to take into consideration materials provided by Robert for the improvements and does not contain a sufficient breakdown of the materials and improvements.

██ [¶ 157] Our initial difficulty with Robert Redland's challenge to the damages award is that his arguments concerning the valuation reports are being made for the first time on appeal, and this Court does not consider issues raised for the first time on appeal. *See Davis v. City of Cheyenne*, 2004 WY 43, ¶ 26, 88 P.3d 481, 490 (Wyo.2004). The defects Robert points to on appeal are defects that would have been better addressed through cross examination of the evidence in the first instance, or at the very least through argument to the district court. The record is unclear as to why the damages evidence was submitted after trial, rather than during trial where it would have been subject to cross examination. The record, however, contains no objection to the procedure, and we will not consider defects in the evidence that are alleged for the first time on appeal.[6]

[¶ 158] We further note that Robert Redland did not present valuation evidence on the improvements made by Rolly Redland. Thus not only did Robert not object to or challenge Rolly Redland's valuation before the district court, he also did not submit his own evidence to contradict that valuation. Finally, we must also note that we find the challenge to the damages awarded for the feedlot that Kendrick Redland built on Manderson Place particularly odd. Robert challenged the valuation on appeal because it did not itemize and provide a credit for material and labor Robert provided in the construction of the feedlot, and yet, Robert's own valuation likewise contained no such itemization or credit. Moreover, Kendrick's report valued the feedlot at $14,239, the amount the district court awarded. Robert's report, on the other hand, valued the feedlot at $15,000. Thus, Robert's own evidence, if it had been accepted by the court, would have resulted in

---

6. The only rebuttal argument Robert presented to the district court in regard to a specific valuation was his objection to the value placed on Kendrick Redland's trailer. On appeal, that is

the one valuation Robert does not contest, which we assume is because the district court apparently accepted Robert's argument and used his valuation for the trailer.

a higher damages award for Kendrick's unjust enrichment claim.

[¶ 159] We find no clear error in the district court's calculation of damages for the unjust enrichment claims of Rolly Redland and Kendrick Redland.

### Election of Remedies

■ [¶ 160] The final argument we must address related to the unjust enrichment claims is Robert Redland's argument that the election of remedies doctrine bars the Redland Children from making claims for both recovery of property and for unjust enrichment for improvements made to that property. We disagree that the Redland Children's alternative claims are barred by the election of remedies doctrine.

■ [¶ 161] Robert Redland is correct that a claimant may not recover inconsistent or cumulative judgments. *Dewey v. Wentland*, 2002 WY 2, ¶ 40, 38 P.3d 402, 417 (Wyo.2002). However, this Court has also recognized that, under the Wyoming Rules of Civil Procedure, a party may plead inconsistent claims in the alternative. We have explained:

> The Wyoming Rules of Civil Procedure are patterned after the Federal Rules of Civil Procedure and Rule 8(e)(2) is identical in both. Frank J. Trelease, *Wyoming Practice*, 12 Wyo. L.J. 202 (1958). Under F.R.C.P. 8(e)(2), a pleader may "set forth inconsistent legal theories in his pleading and will not be forced to select a single theory on which to seek recovery." 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1283, at 533–35 (2d ed. 1990). The pleader is not required to elect between inconsistent remedies at the pleading stage of litigation. *See, e.g., McIntosh v. Magna Systems, Inc.*, 539 F.Supp. 1185, 1190–91 (N.D.Ill. 1982) (though plaintiff cannot recover under theories of both quantum meruit and express written or oral contract, Rule 8(e)(2) provides for inconsistent claims); *Kilday v. Econo–Travel Motor Hotel Corp.*, 516 F.Supp. 162, 163 (E.D.Tenn. 1981) (plaintiff may assert allegations for rescission of contract and recovery of damages for breach at the same time); *McAn-*

*drews v. Goody Company*, 460 F.Supp. 104, 106 (D.Ne.1978) (plaintiff may plead under 8(e)(2) theories of specific acts of negligence and *res ipsa loquitur* ).

> Alternative and inconsistent pleading, permitted under the Wyoming Rules of Civil Procedure, articulates the philosophy that parties who are given the capacity to present their entire controversies should in fact do so. *Lane Company v. Busch Development, Inc.*, 662 P.2d 419, 423 (Wyo. 1983). This court has acknowledged the presentation of alternative and inconsistent claims. Under W.R.C.P. 8(e), a plaintiff in a recent case was not estopped from alleging a county employee acted outside the scope of his duties while also claiming injury from the same employee through acts within the scope and course of employment. *Milton v. Mitchell*, 762 P.2d 372, 378 (Wyo.1988).

*Glover v. Giraldo*, 824 P.2d 552, 556 (Wyo. 1992).

[¶ 162] The Redland Children's claims for recovery of the disputed trust property and their claims for unjust enrichment are indeed inconsistent claims. The children cannot both recover the land and the damages judgment for improvements made to that land. The children's election of remedies need not, however, be made at this stage of the proceedings. If, on remand, the district court finds for the Redland Children on the alleged land conveyance agreements, then they will, at that time, be required to choose between the alternative and inconsistent judgments. *See, e.g., Slover v. Harris*, 77 Wyo. 295, 314 P.2d 953, 965–966 (1957) (remanding with direction that plaintiffs choose between alternative awards for *quantum meruit*, monetary relief under the terms of a will, or a life estate under the will); *see also Heim*, 151 A.2d at 557–558 (considering alternative claims of property recovery under oral agreement and unjust enrichment for improvements made to property).

### C. Robert Redland's Appeal from Redland Angus Partnership Ruling

#### 1. Overview of Facts Related to Robert Redland's Appeal

[¶ 163] As we begin our discussion of this part of the appeal, we note that the district

court ruled on Robert Redland's partnership claim following a bench trial. Our standard of review requires deference to the district court's opportunity to assess witness credibility and weigh conflicting evidence, requires that we accept the evidence of the prevailing party below as true and give that party every reasonable inference that can fairly and reasonably be drawn from that evidence, and requires that we accept the district court's factual findings unless we find them to be clearly erroneous. *See Claman,* ¶ 22, 279 P.3d at 1012. The following factual overview is thus stated with due deference to the district court's factual findings. To the extent that consideration of other evidence enters our analysis, we will set forth that evidence in our discussion of the district court's ruling.

[¶ 164] As we stated earlier, Kendrick Redland began his full-time career as a rancher in 1973. In the spring of 1979, Kendrick purchased some registered Angus cows. At some point in 1980, Robert Redland approached Kendrick and expressed a desire to get some bull calves out of Kendrick's Angus operation. After continued discussions, Kendrick rejected the idea of a partnership but agreed to a calf-share arrangement. Under the calf-share arrangement, Kendrick and Robert would share in the cost of purchasing cows, and then Robert would take any bull calves born to the cows and Kendrick would take the heifer calves.

[¶ 165] Robert was not interested in buying into the first cows that Kendrick purchased, but when Kendrick bought another group of cows, Robert bought into that group. After the cows were purchased, Kendrick bred them by artificial insemination and paid the cost of the breeding. From those cows that Kendrick and Robert bought together, Kendrick kept the heifer calves and bred them to build up his Angus herd, and Robert took the bull calves to "use them on his commercial herd or sell them or whatever." Kendrick used a separate UC Bar brand for his Angus herd, which brand was in his name only.

[¶ 166] Kendrick continued to purchase Angus cows, and Robert paid half on some of the cows but not all of them. Those cows

that Robert did not share in the cost of were not part of the calf-share arrangement, and Robert did not receive the bull calves born to those cows. In total, Kendrick and Robert shared in the cost of approximately twenty to thirty cows. The cows were expected to produce five calves over their useful lives, and then the cows would be culled from the herd. When a cow that Kendrick and Robert had shared in purchasing was culled, they would split the cull price.

[¶ 167] In 1984, Kendrick married his wife, Sharon, and she immediately began to work in Kendrick's registered Angus operation. Kendrick considered Sharon a partner in his Angus operation, but he did not consider her a partner in the calf-share arrangement between Robert Redland and him.

[¶ 168] Redland Angus held its first production bull sale in 1990. In the years 1990 through 1993, Redland Angus issued checks to Robert Redland from those sales, but the testimony conflicted as to whether those checks were distributions or something else, such as loans, rent payments, rebates for bulls purchased by Robert, payment for excess bull calves that Robert did not wish to take from the calf-share agreement, or payment for Robert's non-registered commercial bulls that were sold in the bull sales.

[¶ 169] In 1992, a checking account was opened in the business name Redland Angus. The signatories on the account were Kendrick and Sharon Redland, and Robert Redland did not hold a checkbook for the account and was not a signatory on the account. Robert did not pay the business's operating expenses or make capital contributions to Redland Angus. Nor did Robert participate in the management of the herd. Kendrick and Sharon made the decisions concerning culling the herd to optimize its genetics, and Robert did not participate in those discussions or decisions. Kendrick handled all management duties with respect to the herd without participation by Robert, which duties were described as follows:

Handled it all, when he put the bulls in, when he pulled the bulls out, calling the vet, choosing what kind of vaccines we are going to use, moving cattle from pasture to pasture, lining up help to move cattle to a

pasture, feeding in the wintertime, making sure that everything was fed and watered, taking care of, taking anything to the vet that needed to be taken to the vet, lining up the trucks to go to sales.

[¶ 170] No written agreement or other document exists formalizing the Redland Angus operation or establishing Robert Redland as a partner in the operation. In 1994, Kendrick and Sharon Redland changed accountants and the new accountant, Ruth Baue, filed a partnership tax return listing Robert as a fifty-percent owner in the operation. Kendrick informed the accountant that this was a mistake and the accountant acknowledged the mistake. Beginning with the tax returns in 1998, the accountant phased Robert out as a partner in the Redland Angus operation over the course of two years.

[¶ 171] The last bull calf produced from Robert and Kendrick Redland's cow-calf arrangement was born in 1996. Robert received his last payment from Redland Angus in 1994, and since 1994, he has attended numerous Redland Angus production bull sales. Until the present litigation, which began in 2008, Robert did not request payment from Redland Angus, did not complain that he was not receiving a distribution, and did not object to the tax returns that phased him out as a listed partner for income tax purposes.

### 2. Discussion of Robert Redland's Appeal

### Evidentiary Ruling

[¶ 172] In his challenge to the district court's ruling on his Redland Angus claims, Robert Redland first asserts that the district court erred in its evidentiary ruling on Exhibit 105, which was a check dated February 11, 1993, from Redland Angus to Robert Redland in the amount of $30,000. In admitting the exhibit, the court required that a sticky note that stated, "Part of bull sale," be removed from the check. The ruling stemmed from the following objection and exchange concerning the exhibit:

MR. DARRAH: Hold on a minute, your Honor.

This is—I made a motion in limine. This is one of the—I have the original

copies of checks. This is one of the—Mr. Worrall made copies of all of his like 40,000 pages of discovery. There is a sticky note to the attorney in the memo section. The original check does not have that; and I have asked to have that redacted because it's attorney-client privilege. It was not intended by my client to be offered or produced. It was done before I was in the case.

I can show the Court a copy of it.

THE COURT: Let's see the original check.

MR. DARRAH: There were several copies that had sticky notes on them that were copied that were intended to be communications between the attorney and client.

THE COURT: The Court will require that we substitute No. 301118 with a copy of the original.

MR. JUROVICH: May I be heard for the record?

THE COURT: You may.

MR. JUROVICH: Your Honor, this was produced to us in discovery this way. It was marked by plaintiffs as an exhibit. This isn't my exhibit. I didn't mark it with this as an exhibit with that on it.

THE COURT: The Court believes that it's important to have the accurate information before it, and the blank check, the check with no memo is correct. The other one, I don't know for sure what that means.

[¶ 173] A district court's evidentiary rulings are discretionary, and we review them as follows:

A trial court's decision on the admissibility of evidence is entitled to considerable deference, and will not be reversed on appeal unless the appellant demonstrates a clear abuse of discretion. As long as there exists a legitimate basis for the trial court's ruling, that ruling will not be disturbed on appeal.

Even if the district court admitted evidence in error, we must consider whether the error was prejudicial or harmless. Error is prejudicial if there is a reasonable possibility that the verdict might have

been more favorable to the defendant if the error had not been made. Prejudicial error requires reversal, while harmless error does not.

*Nelson v. State,* 2010 WY 159, ¶ 29, 245 P.3d 282, 289 (Wyo.2010) (quoting *Reay v. State,* 2008 WY 13, ¶ 8, 176 P.3d 647, 650 (Wyo. 2008)).

[¶ 174] We find no abuse of discretion in the district court's evidentiary ruling. There is no dispute that the sticky note was not part of the original check, and it is certainly understandable that the court would want the evidence in its original, authentic form, without the addition of a note added during litigation. Moreover, after the exhibit was admitted, the parties were permitted to provide testimony, on direct examination and cross examination, as to why the check was issued. The district court itself examined Kendrick Redland closely on the question of what type of payment the checks from Redland Angus to Robert Redland represented:

Q. Mr. Kendrick [sic], maybe I can be more blunt than either of the lawyers. You are saying this wasn't a partnership, and Bob Redland says it was a 50/50 partnership, and you wrote a check for half of the bull sale. Now, tell me why that doesn't indicate a 50/50 partnership.

A. Well, we were—I was trying to be fair and make sure that he was paid out on the deal. He did not pay any expenses. There were never any expenses deducted for him. Not once do you see any expenses that were ever deducted for Bob on any of that.

Q. So you are saying, you just came up with the half as that was a fair way to split it up?

A. Well, I am not going to be accused of not paying enough on something, but I don't think you will ever find where he ever paid any expenses. Sharon and I paid all the expenses.

\* \* \*

Q. It's Exhibit 103, and the number is 301031. And this is the same question. The note says you paid him half of the '91 bull sale, and it's $50,690.79.

A. Right.

Q. Why shouldn't I conclude that that means he had half of the business right there?

A. Well, if he did he should have been paying half of the expenses.

Q. Tell me why did you write the check for this amount? I heard about expenses, but why did you choose this amount and write it was for half of the bull sale?

A. I don't know, Judge, why, other than my father, and I wanted to make sure that I paid enough for they have helped me get started.

Q. In those days did you think he was entitled to half of the proceeds from the bulls?

A. I wanted to make sure he was paid out, Judge.

Q. 104, we just heard about it again, and it's $40,000, and I didn't think I got a clear answer as to what that $40,000 was for.

A. That was when my Uncle Eric had died. My dad came to me at that State Place that needed to get paid for, and he said he needed $40,000. I wrote him a check for $40,000.

Q. Okay. And 105, No. 301118, that's the $30,000 check that has no notation. Tell me what that was for.

A. You know, that one, I cannot tell you what that is. I have no recollection of what that was for, whether it was a loan, or what it was. I don't know. We loaned Bob money over the years.

Q. Do you think it was a loan?

A. It could have been. I don't know on that.

Q. Did you get promissory notes when you had loans?

A. We never did.

Q. Did you get paid back?

A. Sometimes I got paid back on loans, sometimes not.

[¶ 175] Exhibit 105 was one of many checks admitted into evidence, and while Robert Redland was not permitted to rely on the sticky note attached to Exhibit 105, other checks, as indicated above, had similar notations in their memo sections. If the court

were going to accept the notation as conclusive or even persuasive evidence of a partnership, it would have done so based on the other checks. The court questioned Kendrick Redland pointedly on the reasons for the payments to Robert Redland and apparently accepted Kendrick's explanations as credible and supported by the other evidence in the record. Given the volume of evidence in the record on the partnership question, Robert Redland simply cannot show prejudice from the exclusion of a single sticky note.

### Partnership Ruling

[¶ 176] The district court ruled against Robert Redland's partnership claim against Kendrick and Sharon Redland. In so ruling, the court concluded:

> There was no partnership agreement establishing Robert as a partner in Redland Angus. Nothing, whether written or verbal, created any right for Robert to share in profits or losses of Redland Angus, or to share in any decision making of Redland Angus. The mistaken tax filing by Redland Angus' accountant does not create a partnership agreement.
>
> The Court finds that Robert Redland is not and was not a partner in Redland Angus.

[¶ 177] The Wyoming Uniform Partnership Act provides that "the association of two (2) or more persons to carry on as co-owners of a business for profit creates a partnership, whether or not the persons intend to create a partnership." Wyo. Stat. Ann. § 17–21–202(a) (LexisNexis 2011). "The basic elements of a partnership or a joint venture are that the parties agree to share in some way the profits and losses of the business venture." *Edler v. Rogers,* 817 P.2d 886, 888 (Wyo.1991). The intent that is determinative is the intent to do things that constitute a partnership. *Murphy v. Stevens,* 645 P.2d 82, 85 (Wyo.1982) (citing *Taylor v. Lewis,* 553 S.W.2d 153 (Tex.Civ.App. 1977) and *Wyatt v. Brown,* 39 Tenn.App. 28, 281 S.W.2d 64 (1955)). "On conflicting evidence, the question of whether a partnership exists is one for the trier of fact." *Murphy,* 645 P.2d at 85.

[¶ 178] In its ruling against Robert Redland on his partnership claim, the district court rejected the checks issued by Redland Angus to Robert Redland between 1990 and 1994, and the tax returns identifying Robert Redland as a partner in Redland Angus, as evidence of a partnership. On appeal, Robert argues that the only way the district court could make such findings was by accepting and relying on the testimony of Kendrick and Sharon Redland. Robert argues the district court was mistaken in such reliance because the testimony of Kendrick and Sharon was not credible.

[¶ 179] We agree that the district court's findings with regard to the checks and tax returns were likely based at least in good part on the testimony of Kendrick and Sharon Redland. We are unwilling, however, to do as Robert Redland suggests and substitute our own credibility determinations for those of the district court. The district court was in a far better position to judge the credibility of the witnesses and their testimony, and as illustrated by the testimony quoted above, the court brought careful scrutiny to the task. Moreover, the record contains other evidence that supports the district court's view of the financial documents and the end determination that the parties did not intend to run a business together and share the profits:

> —As indicated by Robert Redland's own testimony, the last time he received a payment from Redland Angus was in 1994, over fourteen years before Robert asserted an interest in the operation in the present litigation;
>
> —Robert Redland began to be phased out as a listed partner in tax returns in 1998, with the phase out completed by 2000, and Robert did not object to that action, or the lack of payment from the operation, until the present litigation was initiated in 2008;
>
> —Robert Redland did not participate in the day-to-day operations of the business, or management decisions concerning the operation, and was not listed as a signatory on the operation's checking account;

—Robert Redland did not contribute to day-to-day operating expenses of Redland Angus and did not make capital contributions to the business; and

—When Robert Redland's dispute with the Redland Children came to a head in 2007, Robert evicted Kendrick Redland and Redland Angus from the Manderson Place.

[¶ 180] Based on the entirety of the record, we can find no clear error in the district court's credibility determinations or its conclusion that the parties did not conduct themselves as partners engaged in a business with the intention of sharing the profits. Nor do we find any clear error in the district court's conclusion that to the extent the calf-share agreement could be considered a joint venture, that venture was completed by 1996, when the last bull calf was born from a cow that Robert Redland and Kendrick Redland purchased together.

## CONCLUSION

[¶ 181] Disputed issues of material fact preclude summary judgment on the questions of whether the Redland Children's property claims are barred by the statute of limitations or the statute of frauds, and we therefore reverse the grant of summary judgment and remand for a trial on those claims.

[¶ 182] We find no clear error or abuse of discretion in the district court's rulings on the unjust enrichment claims and Redland Angus partnership claims, and we affirm those rulings.